# COGHLAN *v.* SOUTH CAROLINA RAILROAD COMPANY.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE DISTRICT OF SOUTH CAROLINA.

No. 47.  Argued October 21, 22, 1891. — Decided December 7, 1891.

When a contract for the payment of money at a future day, with interest meanwhile payable semi-annually, is made in one place, and is to be performed in another, both as to interest and principal, and the interest before maturity is payable according to the legal rate in the place of performance, the presumption is, in the absence of attendant circumstances to show the contrary, that the principal bears interest after maturity at the same rate.

The report of the master in a suit in equity to foreclose a railroad mortgage, to whom it had been referred to take proof of the claims, found as to a bondholder, that his bonds were due and unpaid, that certain coupons had been paid, and that certain other subsequent coupons had been paid, but made no mention of the intervening coupons. No exception was taken to this report. *Held,* that it was a reasonable inference that the claimant did not offer these coupons in proof, and that the failure to find as to them could not be urged as an objection to the final decree.

THE court stated the case as follows:

By an act of the general assembly of South Carolina, of December 19, 1835, the Cincinnati and Charleston Railroad Company was incorporated with power to construct a railroad from Charleston, South Carolina, to Cincinnati, Ohio. 8 Stats. So. Car. 409. See also 8 Stats. So. Car. 354, 355, 380, 384, 406. Subsequently, December 21, 1836, the name of that company was changed to that of the Louisville, Cincinnati and Charleston Railroad Company. 8 Stats. So. Car. 96. By a later act, passed December 19, 1843, the name of the latter company was changed to that of the South Carolina Railroad Company, which acquired, subject to certain conditions, the rights, privileges, and property of the South Carolina Canal and Railroad Company incorporated December 19, 1827. 11 Stats. So. Car. 273

The Louisville, Cincinnati and Charleston Railroad Company, before its change of name, and by virtue of an act of December 20, 1837, and an act amendatory thereof, passed December 19, 1838, 6 Stats. So. Car. 571, 604, issued its bonds for the sum of about four hundred and fifty thousand pounds sterling, redeemable on the first day of January, 1866, and bearing interest at the rate of five per cent per annum, some in denominations of £500, others of £250. The £500 bonds were in the following form:

" £500 st'g.                                          £500 st'g.
" UNITED STATES OF AMERICA, STATE OF SOUTH CAROLINA.
" *Five Per Cent Loan.*

" The Louisville, Cincinnati and Charleston Railroad Company, under the guarantee of the State of South Carolina, promise to pay to bearer five hundred pounds sterling, redeemable on the first day of January, one thousand eight hundred and sixty-six, and not before without the consent of the holder of this certificate, with interest thereon at the rate of five per cent per annum from the date hereof, the said interest to be paid semi-annually, on the first days of January and July, on presenting the proper coupons for the same at the house of

Palmers, Mackillop, Dent & Co., London, where the principal will also be redeemed on the surrender of this certificate.

"In witness whereof the said company has "[SEAL.] caused its corporate seal to be hereunto affixed, at Charleston, this 31st day of December, 1838.

"ROB'T Y. HAYNE, *President.*

"E. H. Edwards, *Sec'y & Treas'r.*"

To each bond a warrant or coupon was attached in this form: "Louisville, Cincinnati and Charleston Railroad Company, warrant No. 49, for £12 10s., being half yearly interest on bond C. No. 18, payable January 1, 1863. E. H. Edwards, Treas'r." These warrants were endorsed: "Payable at Messrs. Palmers, Mackillop, Dent & Co."

The £250 bonds were in the same form as the ones of larger amount, the coupons or warrants calling only for £6 5s. interest.

Upon the back of each bond was endorsed the above act of December 20, 1837, in these words:

"An act to lend the credit of the State to secure any loan which may be made by the Louisville, Cincinnati and Charleston Railroad Company, and for other purposes.

"*Be it enacted* by the Senate and House of Representatives, now met and sitting in General Assembly, and by the authority of the same, That the faith and funds of the State of South Carolina be, and the same are hereby, pledged to secure the punctual payment of any contract which shall be made for borrowing money by the Louisville, Cincinnati and Charleston Railroad Company from any person or persons, company or companies, corporation or corporations, to any amount not exceeding two millions of dollars, either in the United States or in Europe; and when such contract or contracts shall be made by bond or bonds, certificate or certificates, or other instrument or instruments, signed by the president of the said company, under its seal, and countersigned by the secretary thereof, it shall be the duty of the comptroller general of this State to endorse thereon that the faith and funds of the State

of South Carolina are pledged to the faithful performance of the said contract or contracts, both as it respects the punctual payment of the principal and of the interest, according to the terms of the said contract or contracts: *Provided*, that the interest to be received thereby and made payable thereon shall not exceed the rate of five per cent per annum; *and provided*, also, that the comptroller general shall not endorse any such contract until five hundred thousand dollars shall be paid to the company on the stock thereof, in which event he shall pledge the funds and faith of the State for one million of dollars; and when five hundred thousand dollars more shall be paid to the company on the stock thereof, the comptroller general shall pledge the funds and faith of the State for one other million of dollars."

Immediately following this copy of the act, on each bond, was this guaranty: "The condition of the above act, having been faithfully complied with, I do hereby, for and in behalf of the State of South Carolina, endorse her guaranty on this bond for the payment and redemption of the principal and interest of the same. Wm. Ed. Hayne, Comptroller."

The appellant, being the owner of six of the £500 bonds, and of twelve of the £250 bonds, with seven semi-annual coupons attached to each, and also some odd coupons, brought this suit, April 4, 1881, in one of the courts of the State of South Carolina, against the South Carolina Railroad Company and others, and prayed that the property covered by the mortgage created by the act of December 20, 1837 — which mortgage the State had failed to foreclose, and could not be compelled by suit to foreclose — be sold, and the proceeds applied, first, to the expenses of the suit, and then to the payment of the bonds held by the plaintiff and other creditors of the same class, with interest up to the time of payment and exchange on London.

The suit was removed into the Circuit Court of the United States for the District of South Carolina, a receiver of which court held possession of the property, under an order made September 19, 1878, in the case of Calvin Claflin *v.* South Carolina Railroad Company.

It is stated in an opinion of the court below, [Record, 132,] that after the bonds matured in 1866, various plans to arrange the debt were suggested, adopted and abandoned; that, finally, the railroad company offered to settle past-due sterling bonds by issuing in exchange first mortgage bonds, not guaranteed by the State, so that for each sterling bond of £250 and the interest due thereon, the holder would get a first mortgage bond of £300, and for each bond of £500 and interest, a first mortgage bond of £600; that the proposed new bonds were dated July 1, 1868, called for semi-annual interest at five per cent, and were made payable, as were the guaranteed bonds, in London; and that Coghlan declined to exchange his bonds for the new ones, but consented to receive, and, in fact, received, payment of semi-annual instalments of interest, precisely as if he had made the exchange — that is, he received interest on his £500 and £250 bonds as if they were, respectively, for £600 and £300.

By a decree entered December 15, 1883, it was adjudged that the plaintiff's recovery for bonds held and proved by him should be as follows: Upon each bond for £500 and £250, respectively, and past-due coupons attached, so held and proved, the sums of £600 and £300, respectively, with interest thereon from 1st July, 1868, at the rate of five per cent per annum, payable semi-annually as if said bonds had on the latter date been exchanged for new bonds for £600 and £300, respectively, dated 1st July, 1868, less all amounts that may have been paid on account of the same by the South Carolina Railroad Company or the receiver thereof as semi-annual interest.

The cause was referred to a special master to take an account of the amount due on the bonds and coupons held by Coghlan. From that decree Coghlan took an appeal, which was, upon his motion, dismissed by this court, May 27, 1887, for the reason, no doubt, that the decree appealed from was only interlocutory. 122 U. S. 649. Upon the return of the cause the master reported that the amount due him up to July 1, 1887, upon the bonds, as if exchanged, calculating the interest at five per cent with semi-annual rests, and giving interest

upon interest at the same rate, was £10,620; and up to February 28, 1883, upon the same basis, was £8625$\frac{20}{100}$. He reported also that on the date last named a tender was made to the plaintiff's then attorney of $44,600. In making his calculations the master reported that the pound sterling in all payments was to be estimated at $4.44$\frac{4}{9}$.

By the final decree, passed November 2, 1887, it was adjudged that the amount due the appellant was £10,798.19$\frac{9}{100}$, the principal and interest on the bonds held by him calculated according to the principles of the master's report; and, rating the pound at $4.44$\frac{4}{9}$, the above amount was equivalent to $47,995.28; the interest, after the decree, to be at the rate of seven per cent per annum.

[This sum did not include the coupons for January and July, 1867, and January, 1868. The record was silent as to the reason for the omission.]

*Mr. H. E. Young* for appellant. *Mr. James Lowndes* was with him on the brief.

The first thing that will strike this court is that the Circuit Court has held that the appellant has done that which he declared he would not do — has not in fact done — and which the respondent's agent assured him he had not done, viz. converted his bonds of 1838, with the State's guarantee on them — with no limit on the value of the pound sterling — with the question of the rate of interest after maturity open — into bonds without this guarantee; with the value of the pound sterling fixed arbitrarily at an amount below its true value with the rate of interest after maturity fixed at five per cent and with the surrender of three coupons, which to the date of the decree, even calculated as the Circuit Court ordered, at five per cent with interest on interest at same rate, amount to £1128 15*s.*, or at the $4.44$\frac{4}{9}$ rate, to $5113.24.

The questions now before this court are: (1) By what law is the rate of interest on these overdue bonds fixed, that of England (five per cent) or of South Carolina (seven per cent)? (2) Is not the appellant entitled to his three unpaid half yearly interest coupons which have been simply ignored by the Circuit Court?

I. The appellant claims that upon all past-due coupons and past-due bonds, he is entitled that interest be calculated according to the rate fixed by law in South Carolina, viz. seven per cent. That this is the rate in South Carolina upon both overdue bonds and coupons, was not disputed. But if it is doubted now, it is enough to refer to the case of *Langston* v. *South Carolina Railroad Co.*, 2 So. Car. 249.

It has also been held in South Carolina that where a person entered into a bond, conditioned for the payment of four per cent interest on legacies till the legatee comes of age, to pay him his proportion of the principal, the legatees are entitled to seven per cent interest (*i.e.* the legal interest of the State) from the time the bond becomes due. *Gaillard* v. *Ball*, 1 Nott & McCord, 67.

In *Brewster* v. *Wakefield*, 22 How. 118, in which the opinion was delivered by Chief Justice Taney, the court held, as to the mode of computing interest where the note did not, by the contract, carry the interest expressed until its full satisfaction, that, when it fell due, the statute must interpose and regulate it. See also *Walnut* v. *Wade*, 103 U. S. 683.

Also in South Carolina when the interest is payable at certain times, interest is calculated on interest from the dates it fell due. *O'Neall* v. *Bookman*, 9 Rich. (Law) 80, 82; *Wright* v. *Eaves*, 10 Rich. (Eq.) 582; *Sharpe* v. *Lee*, 14 So. Car. 341.

Though as fixed by this court in *Holden* v. *Trust Co.*, 100 U. S. 74, this "question of interest is always one of local law;" the rule of this court is the same as that of South Carolina. *Brewster* v. *Wakefield*, 22 How. 118; *Aurora City* v. *West*, 7 Wall. 82; *Bernhisel* v. *Firman*, 22 Wall. 179; *Holden* v. *Trust Co.*, 100 U. S. 72; *Ohio* v. *Frank*, 103 U. S. 697; *Mass. Benefit Association* v. *Miles*, 137 U. S. 690.

As to the question of the rate. Does the law of South Carolina, seven per cent, govern? or does the law of England, five per cent, govern? We submit that the law of South Carolina does!

No question of law has been more unsettled than this — whether the *lex fori* or the *lex loci contractus* shall prevail. It has never been definitely settled. See 16 Am. Law Review, 497;

Story Conflict of Laws, 7th ed. § 298, *a.* One of the most recent and satisfactory solutions is by Professor Bar of Gœttingen. He says: "If in some foreign country where a subject of this country has an estate or a trading house, a higher rate of interest than ours is allowed and is in use by reason that capital is more scarce or the security is not so good, then the foreign lender, with whose money the estate has been improved or the trading concern extended, is entitled even in our courts to demand his higher rate of interest as was arranged. The restrictions on the rates of interest are local taxes upon the price of money. The opposite theory, instead of benefiting our citizens, would destroy their credit."

In our case, no rate of interest after maturity is fixed, nor is any place fixed for its payment after maturity — no agent is appointed in England, to accept service of legal proceedings — nor was it in any way possible to obtain a judgment in England which could be enforced against the company's property. The only remedy Coghlan had was to appeal to the State, or, as that, since the close of the war, is notoriously useless, to enforce the statutory mortgage given to the State to secure their bonds.

The cases in the United States Supreme Court show the same apparent discrepancy, though real agreement on the point suggested by Professor Bar that, after maturity, the rate of interest allowed is that of the place where the money is really used. *De Wolf* v. *Johnson,* 10 Wheat. 367; *Andrews* v. *Pond,* 13 Pet. 65; *Cook* v. *Moffat,* 5 How. 295; *Miller* v. *Tiffany,* 1 Wall. 298.

II. As to the coupons ignored by the decree. These coupons are still attached to the bonds, in the hands of the appellant, who is also the holder of the bonds. That they are not barred by time was not questioned. They became due January and July, 1867, and January 1, 1868. This suit was begun on the 4th April, 1881. Twenty years is the bar to the bonds in South Carolina. *Shubrick* v. *Adams,* 20 So. Car. 49, 52; *The City* v. *Lamson* 9 Wall. 477; *Lexington* v. *Butler,* 14 Wall. 282; *Clark* v. *Iowa City,* 20 Wall. 583; *Bond Debt Cases,* 12 So. Car. 200, 273.

*Mr. William E. Earle* for appellee.

Mr. Justice Harlan, after stating the case, delivered the opinion of the court.

We have seen that the bonds in suit were redeemable on the first day of January, 1866, and not before without the consent of the holder, and were payable in pounds sterling with interest at the rate of five per cent per annum from date, the interest to be paid semi-annually on named days, "on presenting the proper coupons for the same at the house of Palmers; Mackillop, Dent & Co., London, where the principal will also be redeemed on the surrender of this certificate." The contract, therefore, was one which in all its parts was to be performed in England. Nevertheless, it is contended that the principal sum agreed to be paid should bear interest at the rate, seven per cent, fixed by the laws of South Carolina. The only basis for this contention is the mere fact that the bonds purport to have been made in that State. But that fact is not conclusive. All the terms of the contract must be examined, in connection with the attendant circumstances, to ascertain what law was in the view of the parties when the contract was executed. For, as said by Chief Justice Marshall in *Wayman* v. *Southard*, 10 Wheat. 1, 48, it is a principle, universally recognized, that "in every forum a contract is governed by the law with a view to which it was made." And by Lord Mansfield, in *Robinson* v. *Bland*, 2 Burrow, 1077, 1078 : "The parties had a view to the law of England. The law of the place can never be the rule when the transaction is entered into with an express view to the law of another country as the rule by which it is to be governed. Now here the payment is to be in England ; it is an English security, and so intended by the parties." Referring to these and many other cases, this court, speaking by Mr. Justice Matthews, held, upon full consideration, in *Pritchard* v. *Norton*, 106 U. S. 124, 136, that the law upon which the nature, interpretation and validity of a contract depended, was that which the parties, either expressly or presumptively, incorporated into it as constituting its obliga-

tion. This doctrine was reaffirmed in *Liverpool &c. Steam Co.* v. *Phœnix Ins. Co.*, 129 U. S. 397, 458, where it was said that, according to the great preponderance, if not the uniform concurrence of authority, the general rule was, "that the nature, the obligation and the interpretation of a contract are to be governed by the law of the place where *it is* made, unless the parties at the time of making it have some other law in view." The elaborate and careful review of the adjudged cases, American and English, in the two cases last cited, leaves nothing to be said upon the general subject.

What law, then, did the parties have in view as determining the legal consequences resulting from the non-performance of the contract between them? Presumptively, the law of England, where the contract was to be entirely performed. The bonds and coupons were to be presented and paid there, and not elsewhere. They were to be paid in pounds sterling at a designated house in London. The fair inference is that the railroad company negotiated the bonds abroad, and made them payable in that city, in order to facilitate a sale of them to foreign buyers. Every circumstance connected with the contract tends to show that the parties intended that all questions in respect to performance or the legal consequences of a failure to perform, were to be determined by the law of the place, and the only place, where the obligation to make payment could be discharged, and where the breach of that obligation would occur, if payment was not made at the appointed time and place. In this view of the contract, the rate of interest, after the maturity of the obligations, was not determinable by the law of South Carolina. This is abundantly established by the authorities.

In *De Wolf* v. *Johnson*, 10 Wheat. 367, 383, the court said: "The legal fulfilment of a contract of loan, on the part of the borrower, is repayment of the money, and the security given is but the means of securing what he has contracted for, which, in the eye of the law, is to pay where he borrows, unless another place of payment be expressly designated by the contract." In *Andrews* v. *Pond*, 13 Pet. 65, 77, Chief Justice Taney, speaking for the court, said: "The general

principle in relation to contracts made in one place to be executed in another is well settled. They are to be governed by the law of the place of performance; and if the interest allowed by the laws of the place of performance is higher than that permitted at the place of the contract, the parties may stipulate for the higher interest without incurring the penalties of usury." So, in *Carnegie* v. *Morrison*, 2 Met. (Mass.) 381, 397, Chief Justice Shaw, after stating the general rule to be that the *lex loci contractus* determines the nature and legal quality of the act done, whether it constitutes a contract, etc., said : "But a contract, made in one country, may contemplate the execution of deeds, or other contracts, making payments or doing other legal acts, in another; in regard to which, the law of the foreign country, where the act is to be done, will govern the contract." In *Cooper* v. *The Earl of Waldegrave*, 2 Beavan, 282, 284, which was an action against the acceptor of bills of exchange, drawn in Paris, where the drawer and acceptor were at the time resident, and made payable in London, the bills, on their face, did not state any particular rate of interest. Lord Langdale, Master of the Rolls, after observing that the law of the country where a contract, merely personal, is made, determines its validity and interpretation, while the law of the forum regulates the mode of suing, and the time within which suit must be brought for non-performance, said : " The contract of the acceptor, which alone is now to be considered, is to pay in *England ;* the non-payment of the money when the bill becomes due is a breach in *England* of the contract which was to be performed in *England.* Upon the breach, the right to damages or interest immediately accrues; interest is given as compensation for the non-payment in *England* and for the delay of payment suffered in *England;* and I think that the law of *England*, that is, the law of the place where the default has happened, must govern the allowance of interest which arises out of that default." See also, *Boyce* v. *Edwards*, 4 Pet. 111, 123 ; *Miller* v. *Tiffany*, 1 Wall 298, 310 ; *Scudder* v. *Union National Bank*, 91 U. S. 406, 412 ; *Scotland County* v. *Hill*, 132 U. S. 107, 116 ; Story's Conflict of Laws, § 291; 2 Kent. Com. 459, 460, 461; *Scofield*

v. *Day*, 20 Johns. 102; *Dickinson* v. *Edwards*, 77 N. Y. 573; *Frees* v. *Brownell*, 35 N. J. Law (6 Vroom) 285, 287; *Pecks* v. *Mayo*, 14 Vermont, 33, 38; *Ex parte Heidelbach*, 2 Lowell, 526, 530; *Hunt's Executor* v. *Hall*, 37 Alabama, 702, 704; *Arnold* v. *Potter*, 22 Iowa, 194, 198.

The cases of *Tilden* v. *Blair*, 21 Wall. 241, 247, and *Equitable Trust Co.* v. *Fowler*, 141 U. S. 384, are in entire harmony with these principles. *Tilden* v. *Blair* was an action by the holder of a bill drawn at Chicago, Illinois, upon parties in New York, and accepted payable at a bank in New York. The defence was usury, and the question was presented as to whether the contract was a New York or an Illinois contract. If a New York contract, there could have been no recovery; for, by the law of that State, if a contract was usurious, it was void, and no recovery could have been had of principal or interest. The court held it to be an Illinois contract and its validity determinable by the laws of that State, for the reason that before the acceptance had any operation, before it became a bill, the acceptors (for whose accommodation the bill was drawn) sent it to Illinois to be there negotiated, and, by that act, indicated a purpose to create an Illinois bill. The court also based its judgment, in part, upon an Illinois statute providing that when any contract or loan is made in that State, or between its citizens and the citizens of any other State or country, bearing interest at a rate that was legal in Illinois, it should be lawful to make the principal and interest payable in any other State or Territory, or in London, in which case the contract or loan should be deemed and considered as governed by the laws of Illinois, and not be affected by the laws of the place where it was to be performed. Rev. Stats. Illinois, 1874, p. 615, c. 74.

It was because of that statute that a note given in Illinois by a citizen of that State to a Connecticut corporation, payable in New York, for money loaned by the latter to the former, and secured by mortgage upon real estate in Illinois, was held, in *Equitable Trust Co.* v. *Fowler*, not to be a New York contract in respect to the interest that might be taken, but to be, in that regard, governed by the laws of Illinois.

The presumption arising from the face of the bonds, that the legal consequences of a failure to pay them, according to their terms, were to be determined by the law of the place of performance, is strengthened by the practical construction the parties put upon the contract after the bonds matured. Seven coupons, with the instalment of interest for July 1, 1866, all held by appellant, were "capitalized" upon the basis of treating the £500 bonds as bonds for £600, and the £250 bonds as bonds for £300. The appellant refused to surrender his bonds, for fear that by so doing he would lose the benefit of the State's guaranty of them; yet he received interest from time to time as if they had been exchanged. On the 13th of April, 1869, a payment was made to him of interest due July 1, 1868, which was endorsed on his bonds, in this form: "Paid on this bond £15, half-yearly dividend due 1st July, 1868, as if it had been exchanged for a new bond." A similar endorsement was made on his bonds for each half-year's dividend or interest up to July 1, 1880. When the receiver, in Claflin v. South Carolina Railroad Company, made payments of interest, such payments were stamped upon the bonds in this form: "Paid £30 sterling, interest due July 1, 1878, and January 1, 1879." For the interest paid to him for July 1, 1879, appellant executed a receipt in this form: "Received of Baring Brothers & Co., as agents of John H. Fisher, receiver of the South Carolina Railroad Company, ninety pounds sterling, being interest due July 1, 1879, on bonds of the Louisville, Cincinnati and Charleston Railroad Company, of £500 each, with eight coupons attached, representing 600 pounds sterling, and numbered, respectively, as follows: 18, 19, 20, 22, 23." Receipts of the same kind were given for him, by his London bankers, for the interest due January 1, 1880. Similar payments of interest were made and endorsed, throughout the whole period from July 1, 1868, to July 1, 1880, on the twelve original £250 bonds, differing from the others only in showing that the half-yearly interest paid on those bonds was £7 10s. The receipts or endorsements on both series of bonds show that, commencing regularly with the interest due July 1, 1868, but including the instalment due July 1, 1866, Coghlan received interest, at the rate of five per

cent per annum, upon the £500 and £250 bonds, respectively, as if exchanged for £600 and £300 bonds. He admits, in his deposition, that the only demand ever made by or on his behalf of interest at the rate of seven per cent on the bonds was by his original complaint in this suit filed August 28, 1880. These facts make it clear that the claim of interest, after the maturity of the bonds, at the rate of seven per cent instead of the rate of five per cent, was an afterthought upon his part.

In what has been said, we have assumed that the allowance of interest at the rate of five per cent per annum was in conformity with the law of the place of payment. The court was not informed by the pleadings or proof as to what that law was, and judicial notice could not, therefore, be taken of it. *Liverpool Steam Co.* v. *Phoenix Ins. Co.*, 129 U. S. 397, 445, and authorities there cited. The railroad company makes no complaint of the allowance that was made of interest, and the appellant does not claim that a larger allowance was required by the law of the place of performance. He insists only that he was entitled, of right, after the maturity of the bonds and the respective coupons, to interest at the rate, seven per cent, fixed by the laws of South Carolina; and this, notwithstanding the guaranty by the State of the faithful performance of the contract of loan was upon the condition that " the interest to be received thereby and made payable thereon " should not exceed the rate of five per cent per annum. For the reasons already stated, we are of opinion that the law of that State did not determine the rate of interest, and that this interpretation of the contract, if it were doubtful, is sustained by the practical construction placed upon it by the conduct of the parties.

One other question in the case requires notice at our hands. The railroad company did not prove payment of the instalments of interest due January and July, 1867, and January, 1868, although the evidence shows payment of the interest due July 1, 1866, and the interest accruing on and after July 1, 1868, up to July 1, 1880. A reversal is asked upon the ground, among the others already examined, that the court erred in

not requiring the interest due on the above dates, respectively, to be paid with interest after maturity to the date of the final decree. No mention is made in the special master's report of May 5, 1882, or in the interlocutory decree of 1883, or in the master's report of 1887, or in the final decree of 1887, of .the interest due January and July, 1867, and January, 1868. There was no exception to the reports of 1882 and 1887, upon the ground that they did . not include interest for those three periods of six months. The reasonable inference is that the appellant did not produce before the master and prove the interest coupons for those periods, or did not ask that they be included in the report as to the amount due upon the basis fixed in the interlocutory decree of 1883. Having failed to except to the report upon the ground that it did not include them, we do not think that the appellant should be now heard to urge this as an objection to the final decree. Besides, as by the evidence the interest due July 1, 1866, was included with the interest due July 1, 1868, in the capitalization whereby the £500 and £250 bonds were treated as if exchanged for £600 and £300 bonds, it would be strange if the instalment of interest due for the intermediate periods of January and July, 1867, and January, 1868, were not embraced by that arrangement. There is no explanation of this in the record. It is not an unreasonable presumption, in view of all the circumstances, that in some way, not disclosed by the evidence, those coupons were settled, or treated as settled, when the railroad company commenced in 1869 to pay, and the appellant received, interest on the bonds, as if exchanged for new bonds of £600 and £300. Be this as it may, we are not inclined to disturb the decree upon the ground that it does not make provision for the interest coupons due January and July, 1867, and January, 1868.

*Decree affirmed.*

Mr. Justice Gray did not hear the argument and took no part in the decision of this case.