## NEW ENGLAND OIL CORPORATION v. ISLAND OIL MARKETING CORPORATION.

(Circuit Court of Appeals, Fourth Circuit. April 10, 1923.)

No. 2060.

1. **Contracts ⬅10(4)—Oil-selling contract held not unilateral, because seller's obligation depended on continuation of production of its wells.**

   An oil-selling contract *held* binding on buyer, as respects objection of lack of mutuality, although the seller was obligated to deliver only from its own wells, and was to be relieved from obligation to deliver on failure of its wells to produce.

2. **Sales ⬅69—Seller of oil held entitled to deliver purchased oil.**

   Although modification of oil-selling contract expressly provided, as the original contract did not, that the seller might deliver purchased oil, *held*, that such a provision was implied in the original contract, so that the seller did not breach its original contract by delivering purchased oil.

3. **Sales ⬅85(2)—Oil-selling contract held conditioned on continued production of seller's wells.**

   A contract for sale of oil *held* to give seller the option, on insufficient production of its own wells, to deliver purchased oil, or to be relieved from delivery because of the decrease of production.

4. **Sales ⬅151—Incorrect construction of contract held not breach.**

   If seller of oil, under a clause allowing decrease in deliveries, owing to decreased production of its wells, wrote letters wrongly construing the contract as to its rights to decrease deliveries, but manifesting an intention to act under its contracts and not in repudiation of them, such letters, although they may have called for a correction of plaintiff's construction, did not warrant the buyer's rescission.

5. **Sales ⬅151—Where buyer rescinded, seller not required thereafter to be ready to perform.**

   Where buyer rescinded contract to buy oil, and notified seller of its refusal to accept further deliveries, it was not necessary for seller thereafter to be prepared and to hold itself in readiness to perform its contract obligations.

6. **Contracts ⬅2, 101(1), 144—Law governing stated.**

   Generally, where a contract is to be performed in a place other than that where made, the law of the place of performance will govern the validity, nature, obligation, and effect of the contract, rather than the law where the contract is made; but the law of the place of making the contract will govern, if that intention is expressed by the parties or is inferable from the circumstances.

7. **Sales ⬅188—Buyer not in default in taking accumulation of oil sold, where seller's election to rely on insufficient production of its wells prevented taking.**

   Where modification of oil-selling contract allowed buyer a certain credit on oil not taken by it on prior installments, in case it took other installments later, it was entitled to such credit, where its taking the later installments was prevented by the seller's election, under the contract to decrease deliveries because of insufficient production of seller's wells.

In Error to the District Court of the United States for the Eastern District of Virginia, at Norfolk; D. Lawrence Groner, Judge.

Action by the Island Oil Marketing Corporation against the New England Oil Corporation. Judgment for plaintiff, and defendant brings error. Affirmed, on condition of remittitur.

---

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

288 F.—61

Thomas B. Gay, of Richmond, Va., and J. Harry Covington, of Washington, D. C. (D. B. O'Connor, of New York City, on the brief), for plaintiff in error.

Frank J. Hogan, of Washington, D. C. (George Bryan, of Richmond, Va., and Frederick T. Kelsey, of New York City, on the brief), for defendant in error.

Before KNAPP, WOODS, and WADDILL, Circuit Judges.

WOODS, Circuit Judge. This action to recover damages for breach of contract for the purchase of oil by the defendant from the plaintiff depended almost entirely on the construction of written contracts and letters. There was some variance in the evidence as to the market value of oil at the date of the alleged breach. The District Judge, construing the written evidence in plaintiff's favor, directed a verdict for the difference between $1.50 a barrel, the contract price of 1,936,393 barrels of oil, and the market price, as the jury should find. The jury, on a basis of a difference in price of 60 cents a barrel, found a verdict for $1,161,835.80 in favor of the plaintiff.

The first contract, of October 7, 1920, was for the sale by Island Oil Marketing Corporation to New England Oil Corporation of 2,700,-000 barrels of oil at the price of $1.50 a barrel. Deliveries were to be made on defendant's tank ships at plaintiff's terminals at Palo Blanco, Mexico, or at the terminal of any other company located on the Gulf of Mexico or the Panuco river. The plaintiff was to deliver, and the defendant receive, all the oil between December 1, 1920, and December 1, 1921; but the plaintiff was to accept defendant's tank ships for loading any time after October 5, 1920. The defendant was to lift—receive and pay for—the oil in equal monthly installments. If the quantity delivered and received should for any month fall below 225,-000 barrels, the plaintiff had the right at its option to deliver the deficiency during any other month or to cancel the deficiency.

The following provisions of section 5 are most important here:

"It is expressly understood and agreed that the obligation of the seller to deliver oil under this contract is limited to production from seller's own wells, or production from wells which seller controls, whether now in existence or hereafter brought in, and in case said wells shall fail to produce oil in commercial quantities, or in case of the production of emulsified petroleum in same, the seller shall thereupon be relieved from its obligations to deliver oil under the contract.

"It is further understood and agreed that in the event production from the well or wells of seller or of seller's affiliated companies, or production from wells which seller controls, whether now in existence or hereafter brought in, shall be decreased by reason of the fact that said well or wells show such percentage of water and/or sediment that they must be closed in to a small operating capacity, or by reason of the decrease of gas pressure from natural causes, thereby decreasing their producing capacity, or by reason of any cause beyond seller's control, then the amounts of oil to be delivered hereunder may be decreased in the same proportion that said production is decreased."

The sworn statement of a responsible official of the plaintiff was to be accepted by the defendant as conclusive proof of the failure of production, or diminution of production, or production of emulsified pe-

troleum; but upon the written request of defendant the sworn statement was to be subjected to tests specified. By the terms of the contract defendant should have lifted by May 1, 1921, 1,124,999 barrels. It actually lifted 476,822 barrels, and was relieved by plaintiff of the obligation to purchase 286,784 barrels. Thus the defendant had failed as of May 1, 1921, in its obligation to lift oil to the extent of 361,393 barrels.

In this situation, on June 10, 1921, a new contract was made as of May 2, 1921, in modification of that of October 7, 1920, by which defendant agreed to take 196,000 barrels of oil in May, 1921, at $1 a barrel, 150,000 in June at 73 cents a barrel, and 1,200,000 barrels in June, July, August, and September at 50 cents a barrel. The contract expressly provided that none of the oil at $1 or at 73 cents a barrel should be credited on the contract of October 7, 1920, for oil at $1.50 a barrel. It provided that one-third of the 50-cent oil should be credited on the untaken $1.50 oil, on condition that the whole 1,200,000 barrels at 50 cents should be lifted during July, August, and September. It further provided that the unlifted portion of oil called for by the October 7 contract, 361,393.22 barrels, and 450,000 barrels at $1.50 a barrel, which defendant—

"will have failed to lift during months of May and June, 1921, making a total of 811,393.22 up to July, 1921, shall be lifted on a schedule of 250,000 barrels a month beginning December 1, 1921, and under the terms and conditions of the contract of October 7, 1920."

The contract of May 2 further provided, in section 9:

"As provided in said contract of the above-mentioned October 7, 1920, seller's obligation to deliver any or all oil set forth in this letter is limited to oil from its own or controlled wells; but in case of failure or insufficiency of production seller may, at its option, deliver purchased oil of similar specifications, and this provision applies to all oil deliverable under said contract of October 7, 1920, and under this agreement."

On July 27, 1921, another modifying contract was made, by which it was agreed that the shortage of 150,000 barrels of 50-cent oil not taken at that time should be added to the October and November commitments, making a total of 475,000 barrels of 50-cent oil to be taken in October and November, 1921. The liftings undertaken in the October contract of $1.50 oil were so deferred by the July 27 contract that these October commitments became November, and November commitments became December. This contract contained these important sections:

"It is further agreed that the date December 1, 1921, mentioned in the thirteenth paragraph of our contract of May 2, 1921, which date refers to the commencement of the liftings of shortages on our $1.50 contract, at the rate of approximately 250,000 barrels per month, will now be postponed to January 1, 1922, the amount of oil and all other conditions to remain the same."

"It is agreed that no credit shall be applied on the contract of October 7, 1920, by the liftings mentioned herein, until and unless lifted during the time specified herein, in which latter event the credits referred to in our agreement of May 2, 1921, will be applied."

In October, 1921, the plaintiff delivered 192,551 barrels of the 475,-000 of 50-cent oil for October and November, leaving undelivered for those months 272,449 barrels. Since no part of the $1.50 oil was due

until November, all October deliveries were on the 475,000 barrels of 50-cent oil.

On October 14, 1921, plaintiff wrote defendant that, owing to causes beyond its control, such as decreases of pressure, a diminution had occurred in the production of its wells. Production for September was stated to be 1,500,000 barrels, and estimated production for October 700,000 barrels. The expectation was expressed of such increased production from a new well as to enable plaintiff to make further deliveries in the latter part of the month. The letter ends with the statement:

"However, in view of our present diminution of production, this advises that we cannot at this date accept definite nominations for the steamship Swiftstar, the Madrona, and the Swifteagle until we know that we shall be able to obtain oil for same."

This letter was verified by oath of plaintiff's president. On October 24 plaintiff wrote another letter, as follows:

"In further reference to our letter of October 14th, this advises that there has been a further diminution of production of our wells, and due to a break in our eight-inch casing on well No. 3, lot 176, we have not to date been able to bring in that well, and we shall not therefore be able to accept further nominations for the present month of October. Our No. 2 Copuchinas, lot 176, has recently been pinched in from the above 30,000 barrels to approximately 20,000 barrels, and we hope to know during this week at approximately what capacity we can stabilize its production for the next few weeks. We believe that it will be to the best interests of all concerned to defer acceptances of nominations of ships until we can accumulate sufficient oil to load our customers' ships in full cargo lots, and we will therefore ask you to defer your nominations for November until you can receive our further advices as to the amounts of oil which will be deliverable to you during the coming month. We will keep you advised as to our November production, and trust that we shall be able to deliver to you a substantial amount of your November commitments."

This letter was not sworn to. At the time these letters were written only the 50-cent oil was in course of delivery, and it seems clear that plaintiff was referring to the 50-cent oil when it said no further "nominations" for October and only a part of the November "nominations" could be accepted. No oil at $1.50 a barrel had been lifted by defendant since April, 1921. For this reason the letters cannot be construed, and they could not have been understood by defendant, as notice of an election by plaintiff to deliver the unlifted portion of the $1.50 oil only in case the product of its own wells or wells controlled by it should be sufficient. The diminution mentioned is to be considered in the light of the fact, known to defendant, that plaintiff had similar obligations to deliver oil to other purchasers.

On October 27 defendant answered as follows:

"We acknowledge receipt of your letter of October 24th. In reply, we beg to state that we consider the letter above referred to and your letter of October 14th as constituting a definite breach on your part of the contract between us referred to in your letter of October 14th, which entitles us to refuse to accept any further deliveries under the contract above referred to, and that we consider the same terminated."

This was an explicit repudiation of obligation under the contract of October 7 to lift the untaken portion of the $1.50 oil. We consider

the pivotal questions of law without referring in detail to assignments of error.

[1] Defendant denies liability on the ground that plaintiff was restricted by the contract of October 7, 1920, to the delivery of oil from wells owned and controlled by it, and first breached the contract by delivery of purchased oil prior to the second contract of May 2, 1921. The contract of October 7, 1920, was for the purchase by defendant of 2,700,000 barrels of oil at $1.50 a barrel. It bound the defendant unconditionally to take and pay for the oil when tendered at the times mentioned. By section 5 it limited the obligation of the plaintiff to deliver oil from wells owned or controlled by it, and provided that plaintiff should be relieved entirely of the obligation to deliver the oil, if such wells should cease to produce oil in commercial quantities, or in case of production of emulsified petroleum. The expression of the limitation that plaintiff was bound to deliver only from its own wells, with the significant omission of any expression that defendant was bound to receive only from these wells, forces the conclusion that no such limitation of the obligation of the defendant to receive was intended. The obligation of a contract does not fail for lack of mutuality, because it is not met by the equivalent obligation of the other party. Central Trust Co. v. Chicago Auditorium, 240 U. S. 581, 594, 36 Sup. Ct. 412, 60 L. Ed. 811, L. R. A. 1917B, 580; Weil v. Chicago Pneumatic Tool Co., 138 Ark. 534, 212 S. W. 313; Texas Seed & Floral Co. v. Chicago Set & Seed Co. (Tex. Civ. App.) 187 S. W. 747; Tebeau v. Ridge, 261 Mo. 547, 170 S. W. 871, L. R. A. 1915C, 367; I Williston on Contracts, § 140; 35 L. R. A. 515, note; 6 R. C. L. 689. Therefore an unconditional undertaking of the buyer to lift the quantity of oil specified when tendered by the seller as agreed is binding, although the consideration for it was the conditional obligation of the seller to deliver only from its own wells, and to be relieved from the obligation to deliver on failure of the wells to produce. In Transcontinental Petroleum Co. v. Interocean Oil Co. (C. C. A.) 262 Fed. 278, relied on by defendant, a somewhat similar provision was held to be reciprocal and to limit the obligation of both parties. But in that case the provision for delivery from plaintiff's well was general, and therefore available to both parties as a limitation of obligation.

[2] It is argued that the express provision of the contract of May 2, 1921, that plaintiff might thereafter deliver purchased oil, implied that the parties did not understand and intend that plaintiff had that right under the contract of October 7, 1920. In our view, the parties only meant to express in the May contract that which was clearly implied in the October contract. The plaintiff therefore did not breach the contract of October 7, 1920, by delivering purchased oil. The principle stated in Norrington v. Wright, 115 U. S. 188, 6 Sup. Ct. 12, 29 L. Ed. 366, and in similar cases in this court, holding that breach of a warranty or of a condition precedent justifies repudiation of the contract, has no application here, because there was no condition or warranty by plaintiff to deliver only from its own or controlled wells.

[3] Defendant's counsel next contend that, since by paragraph 14 of the May contract it was agreed that the 1,200,000 barrels of 50-cent

oil was a "firm purchase," and that defendant should pay for it, whether taken or not, plaintiff was also bound to deliver that quantity, whether produced by its own wells or not, and that therefore plaintiff breached the contract when it notified defendant it would be short in deliveries because of diminution of production of its own wells. This argument would be conclusive, but for the express and controlling provision of section 9, that in case of failure or insufficiency of its own production plaintiff should have the option—not the obligation—to deliver purchased oil. This is made very plain by section 5 of the contract of October, 1920, read in connection with sections 9 and 14 of the contract of May, 1921.

Plaintiff, in its letter of October 14, 1921, gave notice of decreased deliveries because of decreased production as compared with the preceding month of September, 1921. The contention of the defendant is that the decrease of production which would warrant decrease of deliveries was the decrease in any current month as compared with the production of September, 1920, the month preceding the execution of the original contract. If this be true, it is argued that defendant was justified in declaring the contract breached by plaintiff, when plaintiff asserted the right to decrease deliveries on an incorrect basis. This construction, plaintiff contends, is negatived by the provision in section 5 that the diminution provided for should apply, not only to wells then producing, but to wells thereafter brought into production by plaintiffs. The meaning of the covenants on this point is not clear. We think, however, the expectation of both sides on October 7, 1920, when the first contract was made, based on production at that time and the increase hoped for, was that the seller would be able to deliver, not only the entire quantity bargained to defendant, but that bargained to other purchasers, from its own wells or wells controlled by it, then in existence or afterwards brought in. This is indicated by the provision of section 5 above quoted and the testimony of the witness Riddell. The diminution provided for probably meant diminution of production below the production at the date of the contract, taking into account the wells then producing and those to be brought in.

[4] But, even if plaintiff in its letter did mistake its rights in this respect, that would not have been such an anticipatory breach as would warrant the defendant in rescinding. It was perfectly manifest from plaintiff's letter that it was intending to act under the contracts and not in repudiation of them. The letters may have called for a request for correction of plaintiff's construction, but they did not warrant rescission. Dingley v. Oler, 117 U. S. 490, 6 Sup. Ct. 850, 29 L. Ed. 984; Hoggson Bros. v. First Nat. Bank, 231 Fed. 869, 146 C. C. A. 65; Pels v. Saxony S. Co. (C. C. A. 4th Cir.) 287 Fed. 282.

[5] The defendant having rescinded the contract and notified plaintiff of its refusal to accept further deliveries, it was not necessary for plaintiff thereafter to be prepared and to hold itself in readiness to perform its obligations under the contract. Central Trust Co. v. Chicago Auditorium, 240 U. S. 581, 36 Sup. Ct. 412, 60 L. Ed. 811, L. R. A. 1917B, 580; Pierce v. Tennessee Coal, etc., Co., 173 U. S. 1, 19 Sup. Ct. 335, 43 L. Ed. 591; Hinckley v. Pittsburgh Steel Co., 121 U.

S. 264, 7 Sup. Ct. 875, 30 L. Ed. 967. The rights of the parties are to be adjudged under the laws of the state of New York, not of Mexico. It is true the oil was to be delivered in Mexico. But the contract was made in New York. Both parties were American corporations, one having its head office in New York and the other in Boston. Payment of the purchase price and all other transactions involved in the purchase under the contract were to take place in New York. All notices called for by the contract were to be given by mailing to the "respective offices of the parties in New York." Above all, the parties expressly agreed:

"This contract shall be construed and take effect in accordance with the laws of New York."

[6] The general rule is that, when the contract is to be performed in a place other than the place where it is made, the law of the place of performance will govern the validity, nature, obligation, and effect, rather than the law where the contract is made; for that is presumed to be the intention of the parties. London Assurance v. Companhia de Moagens, 167 U. S. 149, 160, 17 Sup. Ct. 785, 42 L. Ed. 113; Coghlan v. South Carolina Railroad Co., 142 U. S. 101, 12 Sup. Ct. 150, 35 L. Ed. 951; Andrews v. Pond, 13 Pet. 65, 10 L. Ed. 61. But the law of the place of making the contract will govern, if that intention is expressed by the parties or is to be inferred from the circumstances. Coghlan v. South Carolina Railroad Co., 142 U. S. 101, 12 Sup. Ct. 150, 35 L. Ed. 951; Liverpool Steam Co. v. Phenix Ins. Co., 129 U. S. 397, 9 Sup. Ct. 469, 32 L. Ed. 788; Pritchard v. Norton, 106 U. S. 124, 1 Sup. Ct. 102, 27 L. Ed. 104; 5 Ruling Case Law, 938. Here all the circumstances indicated that intention, and it was explicitly expressed by the parties.

The position is untenable that the liftings of 675,000 barrels of $1.50 oil, undertaken in the October, 1920, contract by defendant for July, August, and September, were canceled by the substitution in the May, 1921, contract of 950,000 barrels of 50-cent oil for these months. The contract of May expressly limits the credit on the $1.50 oil on account of the liftings of the 50-cent oil to one-third of the total 1,200,000 gallons, and that, too, on the condition that the whole should be lifted during June, July, August, and September. This impliedly excludes any other credit on the October contract for $1.50 oil on account of liftings of the 50-cent oil.

[7] We think the defendant should have been allowed the credit of one-third of 1,200,000 barrels—400,000 barrels—of the 50-cent oil on the unlifted 1,936,393 barrels of $1.50 oil. Under the contract of May 2, 1920, defendant would have been entitled to that credit, if it had taken the whole 1,200,000 barrels of 50-cent oil during June, July, August, and September. By the contract of July 27 the obligation to take the unlifted portion of the 1,200,000 barrels was postponed to October and November. And that contract provided:

"It is agreed that no credit shall be applied on the contract of October 7, 1920, by the liftings mentioned herein, until and unless lifted during the time specified herein, in which latter event the credits referred to in our agreement of May 2, 1921, will be applied."

These provisions for the conditional credit of 400,000 barrels were separate agreements, subsidiary to the contracts of sale and purchase. They called for co-operation by the parties—one to deliver, and the other to accept—and the buyer could not be deprived of the benefit of them for lack of plaintiff's co-operation by delivery. Under these provisions, if defendant had actually taken all that remained of 50-cent oil in October and November, clearly it would have been entitled to have the quantity of $1.50 oil it was under obligation to take reduced by 400,000 barrels. It appears that defendant was ready and willing to lift all that remained undelivered of the 50-cent oil when plaintiff wrote its letters of October 14 and 24, saying because of decreased production of its own wells it would be unable to deliver all of it in October and November as contemplated. This, as we have held, was not a breach by plaintiff of the contract, because it was not bound to purchase oil to deliver to defendant. But, none the less, the failure to deliver all of the 50-cent oil in October and November came from the plaintiff's side. The plaintiff, under the contract, could have purchased and delivered all of it to the defendant. The exercise by plaintiff of its right to rely on its own wells and to reduce its deliveries for October and November could not deprive the defendant of its right to a benefit resting on its willingness and ability to receive and pay for all the 50-cent oil. There was no default of the defendant to lift this oil in October and November, because the plaintiff gave it no opportunity to lift it. The seller was therefore estopped from denying compliance with the condition by the buyer. In other words, the plaintiff cannot avail itself of defendant's failure to meet the condition on which the credit of 400,000 barrels to defendant depended, when the plaintiff voluntarily chose to make defendant's compliance impossible by electing to rely on insufficient production of its own wells. Williams v. Bank of United States, 2 Pet. 96, 102, 7 L. Ed. 360; Crescent Mining Co. v. Wasatch Mining Co., 151 U. S. 317, 322, 14 Sup. Ct. 348, 38 L. Ed. 177; Du Pont de Nemours Powder Co. v. Schlottman, 218 Fed. 353, 134 C. C. A. 161; Black v. Woodrow, 39 Md. 194, 215; Fallon v. Lawler, 102 N. Y. 228, 6 N. E. 392.

We are of the opinion that the jury were properly instructed that the defendant had breached its contract to purchase oil. But, for the reasons stated, we are also of the opinion that the defendant was entitled to a credit of 400,000 barrels on the quantity of oil it had contracted to buy at $1.50 a barrel, thus reducing it from 1,936,393 to 1,536,393 barrels. This at 60 cents, the difference in price found by the jury, would be $921,835, less than the verdict by $240,000.

The judgment is reversed, and a new trial ordered, unless the plaintiff shall within 40 days remit therefrom the sum of $240,000. If the plaintiff shall remit the sum of $240,000 from the judgment within 40 days, the judgment will stand affirmed, with the costs of this court against the plaintiff.

Reversed nisi.

KNAPP, Circuit Judge, who took part in the hearing of this case, died before the opinion was announced.