## PHILADELPHIA WAREHOUSE CO. v. SEEMAN et al.

(Circuit Court of Appeals, Second Circuit. May 11, 1925.)

No. 220.

1. **Usury ⊂═⊃12—Corrupt intent, by person who takes security, to secure an illegal rate of interest, necessary to taint loan with usury.**

To taint a loan with usury, a corrupt purpose or intent, by person who takes security, to secure an illegal rate of interest for money or forbearance of money, must exist as a fact or in law, and it must appear that real purpose of negotiations was on one side to loan money at usurious interest, reserved in some form by contract, and on other side to borrow on usurious terms dictated by lender.

2. **Usury ⊂═⊃28—Greater discount may be charged for loan of credit than prescribed rate of interest without contravening usury law.**

Any person may sell his credit at whatever price he can get for it, and if transaction is in good faith, a greater discount may be charged than prescribed rate of interest, without contravening usury laws.

3. **Usury ⊂═⊃113—Defense of usury must be proved by party asserting it.**

Where usury is interposed as a defense in a suit to enforce a loan, it must be proved by the party asserting it.

4. **Usury ⊂═⊃28—Loan of credit held not void for usury.**

Loan of credit by lender, delivering its promissory note to a merchant, who pledged with it merchandise to insure payment of its note at maturity, bearing interest of 3 per cent. per annum to cover lender's services for advancing credit, *held* not void for usury, in view of Act Pa. May 28, 1858 (P. L. 622; Pa. St. 1920, §§ 12491, 12492), though loan was discounted 3 per cent. when lender delivered its note to borrower, and borrower was required to pay note broker an additional percentage to effect sale of note.

5. **Usury ⊂═⊃2(2)—Loan of credit held governed by laws of state of Pennsylvania.**

Loan of credit by lender, delivering its note to borrower, who pledged with it merchandise to insure payment of its note at maturity, and lender's note being turned into cash by sale through note brokers, *held* governed by laws of state of Pennsylvania, where entire transaction took place there, with exception of signing of pledge agreement and delivery of instruction to have note sold, and eventual receiving of money by borrower, which parts of transaction were for borrower's convenience.

6. **Contracts ⊂═⊃101(1)—Test of place of contract stated.**

The test of the place of a contract is where last act was done by either of parties thereto, which was essential to a meeting of the minds.

7. **Contracts ⊂═⊃101(1)—Law of place of performance controls as lex loci.**

Law of place of performance of a contract controls as the lex loci.

In Error to the District Court of the United States for the Southern District of New York.

Suit by the Philadelphia Warehouse Company against Joseph Seeman and others, copartners doing business under the firm name and style of Seeman Bros. Judgment for defendants, and plaintiff brings error. Reversed.

Leventritt, Riegelman, Carns & Goetz, of New York City (David Leventritt, Charles A. Riegelman, and Norman S. Goetz, all of New York City, of counsel), for plaintiff in error.

Cohen, Cole & Weiss, of New York City (Samuel F. Frank, Harry J. Leffert, and Arthur W. Weil, all of New York City, of counsel), for defendants in error.

Before HOUGH, MANTON, and HAND, Circuit Judges.

MANTON, Circuit Judge. The plaintiff in error is a Pennsylvania corporation doing a warehouse business in that state, and the defendants in error are copartners engaged in the wholesale grocery business in New York state. The action is brought to recover $8,000 for the conversion of cases of salmon, title to which was in the plaintiff in error under a negotiable railroad bill of lading indorsed to it by the pledgor, Coccaro & Co., a partnership, in New York City, on

November 18, 1919. · They 'were pledged as security for an advance of credit in the sum of $5,900 to be made by the plaintiff in error under the terms of a pledge agreement, to be held as security also for other advances of credit, prior and subsequent. The answer, which was sustained by the jury's verdict below, was that the loan to A. J. Coccaro & Co. was usurious, and that the defendants in error purchased the salmon in good faith and for a valuable consideration. A. J. Coccaro & Co. became bankrupts.

A note for $5,900, dated November 18, 1919, payable January 20, 1920, was issued and delivered to the plaintiff in error. This note was sold in Philadelphia, Pa., by a firm of note brokers on November 19, 1920, under a written order from A. J. Coccaro & Co. The net proceeds of this sale, $5,834.20, represented by a cashier's check to the order of the plaintiff in error, was received by it from the note brokers and thereafter indorsed and delivered by it to the order of the First National Bank of Philadelphia. This bank at once remitted to A. J. Coccaro & Co. in New York City, at their request, by a transfer of such funds to the Irving National Bank. The business of the plaintiff in error for fully half a century had been to loan its credit by delivering its promissory note to a merchant, who pledged with it merchandise to insure payment of the merchant's note at maturity. The pledgor received a note, which could readily be turned into cash by its sale through note brokers through various banks throughout the country. Thus, in this way plaintiff in error advanced its credit upon merchandise deposited with it as collateral to an agreed percentage of the market value of such merchandise. This was determined by the plaintiff in error's inspection and appraisal.

The charge for issuing its promissory note against the pledge of the merchandise in a public warehouse was 3 per cent. per annum upon the face amount of its notes so issued. Beyond this charge, no other remuneration or commission was directly payable to it, but the pledgor or borrower would pay a commission to a note broker in consideration for the sale by him as the agent of the borrower. Its practice was to deliver to the borrower the identical check received from the broker. It was the policy to sell through brokers, because this was a business in itself, and is now a recognized method of disposing of commercial paper throughout the country. This method of doing business typified the transaction involved in this litigation. The document used was a printed pledge agreement, which read in part as follows:

"Having deposited with, and confided to the management, custody, and charge of, the Philadephia Warehouse Company the property belonging to us described in the foregoing invoice, and that company having advanced its credit to us upon security of said property and upon our warranties herein recited, by delivery to us of its promissory note for five thousand nine hundred dollars, dated November 18, 1919, payable January 20, 1920, receiving thirty and 48/100 dollars as commission for its responsibility and services, as above and advance of its credit: Now, in consideration of said advance, we do hereby promise and agree to and with the said company that we will pay to it, at its office in the city of Philadelphia, at or before the maturity of its said promissory note, five thousand nine hundred dollars, together with all charges for storage, insurance, and other necessary expenses, including counsel fees, on account of the said property so confided to its management, custody, and charge. * * *

"3. The property pledged hereunder, together with any heretofore or hereafter pledged by the undersigned to the said company to secure this or any other liability, general or special, shall constitute a general continuing collateral security for all obligations or liabilities of the undersigned to the said company now existing or hereafter created, contingent, absolute, liquidated, or unliquidated, and the said company's right, title, and interest therein shall be prior to all liens or claims thereon, or on the proceeds thereof. And if any property be consigned or delivered to the said company by the undersigned, either in substitution for property withdrawn or as additional security, such substituted or added collateral shall be subject to all the terms and conditions of this contract, including the maintenance of whatever margin may be stipulated for in case of such property."

The notes were delivered as above indicated and the money paid. When the salmon was pledged under this agreement at the request of A. J. Coccaro & Co., the plaintiff in error instructed the Yorke Warehouse & Storage Company, Inc., of New York City, to secure the cases of salmon from the railroad and store the same in one of its warehouses for the security of the plaintiff in error. Thereafter the plaintiff in error received from a warehouse a nonnegotiable warehouse receipt for

the salmon and between February 25 and March 26, 1920, the defendants in error and their assignors removed the cases of salmon from the warehouse under an order issued by Coccaro on February 8, 1920. This appropriation was made possible through the fact, which was unknown to the plaintiff in error, that the Yorke Warehouse was owned by Coccaro through stock ownership, and that its employees would do their bidding pursuant to instructions. Coccaro asked for extensions of time to pay the note of $5,-900, and this was granted. The procedure each time followed its regular method of business dealing, which is referred to above.

The bankruptcy of A. J. Coccaro & Co. occurred prior to the last advance. The firm was indebted for its advances of money loaned, and these credits form the basis of this suit. The defense of usury is based upon the claim that this was not a loan of credit, but a mere sham and a device for which the forms used by the plaintiff in error were a mere cover, and that in fact the actual agreement between the plaintiff in error and Coccaro was for loaning them moneys from time to time upon merchandise in warehouses as security, and that Coccaro did pay one-half per cent. per month, which was the market rate for money, one-fourth per cent. per month to the plaintiff in error for making up its 3 per cent., and one-sixteenth per cent. per month to the note brokers, all of which amounted to more than 6 per cent., the legal rate of interest chargeable in New York. The claim is that the contract is governed by the laws of New York and is usurious. The court submitted the question of usurious charge to the jury, and it found for the defendants in error.

[1-3] The plaintiff in error's contracts and method of transacting its business has met with the approval of the highest court in Pennsylvania. Righter & Sowgill v. Philadelphia Warehouse Co., 99 Pa. 289. The courts have long recognized the difference between a lending or sale of credit and the lending of money, and have repeatedly held that for a lending or sale of credit any price demanded may be paid by the borrower without subjecting the contract to the taint of usury. Ryttenberg v. Schefer (D. C.) 131 F. 313; Title Guarantee & Surety Co. v. Klein, 178 F. 689, 102 C. C. A. 189, 29 L. R. A. (N. S.) 620; Meaker v. Fiero, 145 N. Y. 165, 39 N. E. 714. In order to taint a loan with usury, a corrupt purpose or intent on the part of the person who takes the security to secure an illegal rate of interest for the money or forbearance of money must exist as a fact or in law. There must be a lender and a borrower, and it must appear that the real purpose of the negotiations and transaction was, on the one side, to loan money at usurious interest reserved in some form by the contract and, on the other side, to borrow upon the usurious terms dictated by the lender. Orvis v. Curtiss, 157 N. Y. 657, 52 N. E. 690, 68 Am. St. Rep. 810. Any person is at liberty to sell his credit at whatever price he can get for it, precisely as he is at liberty to sell any other commodity which he may have. If the transaction is in good faith, and not a mere cloak or device for covering a usurious contract, a greater discount may be charged than the prescribed rate of interest without contravening the usury laws. And, where usury is interposed as a defense, it must be proved by the party asserting it. In the plaintiff in error's case in Pennsylvania, where the court there had occasion to consider the claim of usurious transactions, it said:

"If the testimony tended to prove that the transaction between the parties was merely a cloak for usury, and not a bona fide contract for the storage and sale of goods, to secure the loan in question, it must be conceded the jury should have been permitted to consider and pass upon the question of fact presented by the plaintiff's first and second points (the first point being the one quoted above); but we fail to discover in the provisions of the contract itself, or in the facts and circumstances connected therewith, from its inception to its completion, anything from which the jury would have been justified in finding that it was, in substance and effect, a loan of money at an usurious rate of interest."

[4] The discount of 3 per cent. was agreed by the parties to be for the loan of the plaintiff in error's credit when it issued and delivered the note which was subsequently sold by Coccaro's agent. The sum paid the note broker was a necessary deduction to effect the sale of the note. The 3 per cent. per annum paid to the plaintiff in error upon the face of the note was to cover its services for advancing their credit; that is, issuing the note and for such other services in connection with the security as might be necessary. Six per cent. was a lawful rate of interest. The compensation paid to the plaintiff in error was a return for the issuance of its note, for its obligation to pay, and the chances of reimbursement from the borrower. We see nothing in the evidence which raised an issue of fact that the trans-

action was otherwise than as claimed by the plaintiff in error. There was nothing to the contrary to submit to the jury, and, in the absence of evidence that the document did not disclose the true transaction, it became the duty of the court below to interpret the documents and to decide what the transaction was, and in this instance, we think, to hold that it was not usurious. This question was presented upon a motion for a direction of a verdict, which was denied, and to which exception was taken. Below there was a failure to distinguish between a loan of money and a loan of credit.

[5, 6] There is another difficulty in sustaining the judgment below. The theory upon which the case was submitted to the jury was that the transaction was a loan made in New York, because the loan was not complete as a loan until the money contracted for reached New York. It was pointed out that the whole inception of the transaction was in New York, as was also the completion of the loan, and it was held that the laws of New York governed. This transaction took place in November, 1919, and extensions were given in January and March, 1920. The first transaction between the plaintiff in error and Coccaro took place in January, 1918, when another note broker introduced Coccaro to the secretary of the plaintiff in error. This interview resulted in the first transaction between the plaintiff in error and Coccaro. However, the documents were dated in Philadelphia and the note was issued there. It was also paid for there. There is no evidence showing or tending to show that anything but the plaintiff in error's customary business methods were followed. The payments to redeem the pledged articles were required to be paid plaintiff in error in Philadelphia; the note brokerage firm carried on its business in Philadelphia and the check representing its proceeds was dated in Philadelphia and forwarded by the plaintiff in error to its bank in Philadelphia. Thus it appears that the entire transaction took place in Philadelphia and within the state of Pennsylvania, with the exception of the signing of the pledge agreement and the delivery of the instruction to have the note sold and the eventual receiving of the money by the Irving National Bank in New York City. These parts of the transaction were for Coccaro's convenience.

The loan did not have its inception in New York, nor was it completed in New York. The transaction was carried out in Philadelphia. The renewals of this extension of credit were in each instance upon written application of Coccaro sent to Philadelphia. The pledge agreement was drawn and dated in Philadelphia; the contract was a unilateral one, and did not become binding in its terms until the plaintiff in error issued its note and that act was done in Philadelphia. Thus the obligations of the contract and its fulfillment are to be determined by the laws of the state of Pennsylvania. The test of the place of a contract is where the last act was done by either of the parties which was essential to a meeting of the minds. Until this act is done, there is no contract, and, upon its being done at a given place, the contract becomes existent and becomes existent at the place where the act was done. Clark v. Belt, 223 F. 573, 138 C. C. A. 1; 2 Wharton on Conflict of Laws (3d Ed.) § 422 (a). In Tilden v. Blair, 21 Wall. 241, 22 L. Ed. 632, a draft was accepted in New York, sent to Illinois to be negotiated, and it was held that the contract was an Illinois contract.

[7] The proceeds of the notes were delivered to Coccaro's representative, the note broker in Philadelphia, and in some of the six transactions were mailed from Philadelphia to their office in New York, or telegraphed to their bank in New York from Philadelphia. Delivery of the money in Philadelphia to the personal representative, the note broker, completed the loan in Pennsylvania, as did also delivery of it to the bank for transmission to New York. When the plaintiff in error put the money in the bank in Philadelphia it was then telegraphed to New York, and plaintiff in error lost control of it to Coccaro's representative in Philadelphia, namely, the note broker. A well-recognized rule of law provides that the law of the place of performance controls as the lex loci. Where the contract was made, and whether the contract was made, and whether the pledge agreement constituted the contract of the parties, becomes quite immaterial, because, under the agreement, performance of the contract—that is, the repayment by Coccaro—was to be in Pennsylvania, and the laws of that state applied. Central Nat. Bank of Washington v. Hume, 128 U. S. 195, 9 S. Ct. 41, 32 L. Ed. 370; Coghlan v. So. Carolina R. R. Co., 142 U. S. 101, 12 S. Ct. 150, 35 L. Ed. 951; N. E. Oil Corp. v. Island Oil Marketing Corp. (C. C. A.) 288 F. 967; Brower v. Life Ins. Co. of Va., 86 F. 748; Northwestern Terra Cotta Co. v. Caldwell, 234 F. 491, 148 C. C. A. 257.

The Pennsylvania statute (Act May 28, 1858 [P. L. 622; Pa. St. 1920, §§ 12491,

12492]) does not make it unlawful for a debtor to pay to a creditor or a creditor to receive more than 6 per cent. interest. Montague v. McDowell, 99 Pa. 265; Stayton v. Riddle, 114 Pa. 464, 7 A. 72. That statute merely gives the borrower the right, where the interest is in excess of 6 per cent., to deduct the excess upon paying the principal debt, or, if it has been paid, to recover such excess, if the action was begun within six months from the time of the payment. The only defense urged below is that of usury. We hold that this transaction was not usurious, and judgment should have been directed for the plaintiff in error.

Judgment reversed.