**UNITED STATES v. SKINNER & EDDY CORPORATION.**

Circuit Court of Appeals, Ninth Circuit.
November 4, 1929.

Rehearing Denied December 17, 1929.

No. 5699.

Wilbur, Circuit Judge, dissenting in part.

See, also, 5 F.(2d) 708.

O. P. M. Brown, Sp. Asst. to Atty. Gen., and Anthony Savage, U. S. Atty., of Seattle, Wash. (Chauncey G. Parker, General Counsel, U. S. Shipping Board, of Washington, D. C., and Jeffrey Heiman, Asst. U. S. Atty., of Seattle, Wash., of counsel), for the United States.

Louis Titus, of Washington, D. C., and George Donworth, Livingston B. Stedman, and William Edris, all of Seattle, Wash., for Skinner & Eddy Corporation.

Before RUDKIN, DIETRICH, and WILBUR, Circuit Judges.

WILBUR, Circuit Judge. This action was brought by the United States, herein-

after referred to as "the government," against the Skinner & Eddy Corporation, hereinafter called the "defendant." Both parties have appealed from the judgment rendered in the United States District Court for the Western Division of Washington. This litigation grows out of several contracts entered into between the United States Shipping Board-Emergency Fleet Corporation, hereinafter called the "Fleet Corporation," on behalf of the government of the United States, and the defendant, for the construction of merchant ships at an aggregate contract price for the ships thus to be constructed of about $150,000,000. Before all the ships contracted for were completed the Armistice was signed, and the Fleet Corporation, acting under authority delegated by the President of the United States, on February 18, 1919, directed the cancellation of the contract for 25 of these ships. The government, through the Fleet Corporation, has paid to the defendant on these contracts, in all, $124,154,143.65. Although these last 25 ships were neither begun nor finished, the government, through the Fleet Corporation, had paid thereon $4,612,500 in accordance with the terms of the contract therefor, which fixed the times of partial payments with reference to the date of the contract and not with reference to the amount of work done upon the contract. The government seeks to recover the amount of $4,612,500 so paid, and seeks, in addition, to recover erroneous payments made to the defendant during the progress of the work in excess of amounts due and also recover for goods and merchandise sold to the defendant by the Fleet Corporation during the progress of the work and for rent on a shipbuilding plant purchased by the Fleet Corporation for the use of the defendant in the shipbuilding operations and to recover certain other items, aggregating in all $11,491,568.78. The government, in the complaint, concedes certain credits to be due to the defendant amounting in all to $3,955,136.70 and prays for a judgment for the balance of $7,536,432.08.

Among the credits thus conceded by the government is one for $2,616,992.06 awarded by the United States Shipping Board as just compensation for the above-mentioned termination of the contract in pursuance of the Merchant Marine Act of 1920 (41 Stat. 988, § 2(c), 46 USCA § 862(c), which required the Shipping Board, as soon as practicable after the passage of the act, to "adjust, settle, and liquidate all matters arising out of or incident to the exercise by or through the President of any of the powers or duties conferred or imposed upon the President by any such Act or parts of Acts [referring to the Emergency Shipping Fund provisions of the Act of June 15, 1917]; and for this purpose the board, instead of the President, shall have and exercise any of such powers and duties relating to the determination and payment of just compensation: Provided, That any person dissatisfied with any decision of the board shall have the same right to sue the United States as he would have had if the decision had been made by the President of the United States under the Acts hereby repealed."

The Emergency Shipping Fund Act of June 15, 1917 (chapter 29, 40 Stat. 182, 183), above referred to, provided that in case of cancellation of contracts for the building of ships, the government should make just compensation therefor to be determined by the President, "and if the amount thereof, so determined by the President, is unsatisfactory to the person entitled to receive the same, such person shall be paid seventy-five per centum of the amount so determined by the President and shall be entitled to sue the United States to recover such further sum as, added to said seventy-five per centum, will make up such amount as will be just compensation therefor, in the manner provided for by section twenty-four, paragraph twenty, and section one hundred and forty-five of the Judicial Code."

The trial court rendered judgment for the government in the sum of $1,339,600.49. During the trial of the case the defendant conceded to the government credits aggregating $1,706,956.14, while the government conceded to the defendant various set-offs, in addition to those above mentioned, for just compensation, aggregating $1,692,702.09. The character of these credits is indicated by the fact that the two largest items of credits conceded to the government were for goods sold and delivered by the Fleet Corporation to the defendant to enable it to carry out its contracts aggregating $1,571,882. The largest items of these set-offs conceded by the government to the defendant were for balance due on the contract price for ships, for bonus, and for overtime, aggregating $1,603,-297.63. On this appeal the controversies involved in the case are narrowed down to the question as to the right of the government to recover $4,612,500 advance payments upon the 25 canceled ships, the right to recover $2,860,528.60 unpaid rental for its shipyard occupied by the defendant, the right to recover $113,800 paid by the Fleet Corporation as bonus for delivery of certain ships

under an alleged misinterpretation of the contract, and on the cross-appeal the right of the defendant to a credit of $745,600 on account of daily bonuses it claims to have earned under the contracts·for the early delivery of ships, and the amount of just compensation to which the defendant was entitled, and also the question of the jurisdiction of the District Court to hear and determine the controversy as to the amount of such just compensation, and the controversies as to interest upon the balances due to the government upon moneys due to it from the defendant.

■ With reference to the right of the government to recover the amounts advanced upon the uncompleted ships, the defendant contends that the government cannot recover the amounts paid by the Fleet Corporation upon the canceled contract, aggregating $4,612,500, for the reason that these payments were made by the Fleet Corporation and not by the government, and that the relationship between the government and the Shipping Board is such that with relation to these payments the rights of the defendant must be adjudicated on the theory that it was dealing with a private corporation, and that the right of recovery, if such right exists, is in the Fleet Corporation, and not in the government. The relation of the Fleet Corporation to the government has been a matter of frequent judicial inquiry and determination. The purpose of the organization of this corporation as a governmental department was to facilitate the transaction of its business and to simplify the fiscal and executive organization of this branch of the government. The formation of the corporation by the government was authorized by Congress as a legal method of cutting red tape. The government owned all of the stock of the corporation. The situation has been changed since some of the decisions relied upon by the. defendant, by legislation dealing with the rights and obligations of the Fleet Corporation. [See sections 2 and 4, Merchant Marine Act of 1920 (41 Stat. 988 [46 USCA §§ 862, 863]); the Housing Act of 1918 (40 Stat. 438); The Sundry Civil Act of 1919 (41 Stat. 181); the Sundry Civil Act of 1920 (41 Stat. 891); The Act of June 12, 1922 (42 Stat. 647), appropriating $50,000,000 for the payment of claims, damage charges, and miscellaneous adjustments under agreements entered into by the United States Shipping Board or the Emergency Fleet Corporation; the appropriation acts of Congress (42 Stat. 1241; 44 Stat. 318)]; and also by ratification by the President (President's Executive Order of December 3, 1918).

It is sufficient for the present purposes to note that in the very act of Congress authorizing the formation of the Fleet Corporation (Act of June 15, 1917, ch. 29, 40 Stat. 182), it expressly provided that upon the cancellation of the shipbuilding contracts of the Fleet Corporation, the United States would pay for the resultant loss or injury, and it is a clear implication that the benefits, or claims, or credits of the Fleet Corporation should follow this burden into the hands of the government. This was conceded in the Court of Claims, where the plaintiff (a shipbuilder) sought to recover just compensation from the United States for the cancellation of a Fleet Corporation contract for the construction of ships and the government counterclaimed for the amounts of payments by it through the Fleet Corporation on the contract price for the ships. The plaintiff was denied relief and the government was given judgment on the counterclaim for $706,908.21. Gilbert, Trustee, v. United States, 60 Ct. Cl. 1005, certiorari denied by United States Supreme Court, 271 U. S. 660, 46 S. Ct. 473, 70 L. Ed. 1137; see, also, Skinner & Eddy Co. v. United States, 58 Ct. Cl. 663; U. S. ex rel. Skinner & Eddy v. McCarl, 275 U. S. 1, 48 S. Ct. 12, 72 L. Ed. 131.

The relation of the Fleet Corporation and kindred organizations to the government is considered in a number of recent cases. Clallam County v. United States, 263 U. S. 341, 44 S. Ct. 121, 68 L. Ed. 328; Erickson v. United States, 264 U. S. 246, 44 S. Ct. 310, 68 L. Ed. 661; United States Shipping Board Emergency Fleet Corp. v. Western Union Tel. Co., 275 U. S. 415, 48 S. Ct. 198, 72 L. Ed. 345. It is sufficient for us to say on the question of the right of the government to sue for a return of its moneys paid out by the Fleet Corporation, and justly belonging to the government, that the interposed agency of the Fleet Corporation as a vehicle of payment is no obstacle to a suit by the government for its return in connection with the liquidation of the contracts of the Fleet Corporation, resulting from a cancellation of its contracts by governmental action. The money had and received by the defendants is that of the government, and it has the right to sue for its recovery.

■ The next point advanced by the defendants on this question is as to whether or not in the cancellation of the contracts a right arises to recover payments made thereon before the cancellation. There seems no serious question as to the right of the government to

recover these amounts. They were not paid for work theretofore done or to cover obligations theretofore incurred by the defendant, but were installments on a lump-sum contract price payable to the defendant for the construction of ships which they never constructed. See U. S. v. U. S. Fidelity & Guar. Co., 236 U. S. 512, 35 S. Ct. 298, 59 L. Ed. 696. It is true that they were not constructed because of the action of the President acting through the Shipping Board in pursuance of the authority delegated to him by Congress, and in pursuance of the law under which the contracts were let and which became, in legal effect, a part of the contract. Russell Motor Co. v. U. S., 261 U. S. 514, 524, 43 S. Ct. 428, 67 L. Ed. 778. The claims of the defendant growing out of the cancellation were to be determined in the manner provided by law. That law was incorporated into the contract and expressly provided for the cancellation thereof by the President of the United States, and provided that in the event thereof the shipbuilder should be entitled to just compensation to be determined by the President of the United States in the first instance, and if his award was not accepted by the shipbuilder, then, upon his application, by the Court of Claims, or in case the amount involved was less than $10,000, by the United States District Courts. Thus, from the beginning, the contract of the defendant by implication provided for its cancellation and for the relative rights of the parties in case of such cancellation, by awarding the contractor just compensation, so that the rights of the parties to payments made under the contracts in case of cancellation were to be determined in view of the fact that the defendant was entitled to just compensation for all it had done under the contract. The government, in default of the production of the ships, was entitled to recover the money paid. See U. S. v. U. S. Fidelity & Guar. Co., supra. The defendant shipbuilder, on the other hand, was entitled to specific rights and remedies provided by law for him under the circumstances. The defendant seeks to retain this money on two theories: First, that the amount of just compensation to which it claims to be entitled should be determined and set off in this action against the claim of the government for moneys paid to it; and, second, on the theory that in an action for money had and received the court entertaining jurisdiction of the action will necessarily determine its equitable right to retain such part of that money as it is justly entitled to either by reason of its part per-

formance of the contract or because of any other equities in its favor growing out of the sudden termination of the contract. The right of the government to recover the amount thus paid is clear. The defendant's contention that in an action to recover money had and received the court will deal with the equitable considerations growing out of the possession of the money and award to the claimant only such amounts as are justly due after considering the equities involved in the action, ordinarily may be true; but in this case the question is not one of form of action or of procedure but is one of jurisdiction; that is, did the trial court have jurisdiction to consider defendant's equities arising out of the cancellation of its contracts in determining the claim of the government for moneys that had been paid for ships that were not built and were not even commenced? Whether the District Court is acting as a court of law or of equity its jurisdiction is regulated by statute, and the jurisdictional question here involved cannot be solved by appeals to equitable considerations, otherwise applicable to such actions, if, in fact, the law under which the contracts were made, not only provided that the rights of the contractor in case of a cancellation of the contract should be measured by what is just compensation to it for the losses suffered by it by the termination of the contract, but also expressly delegated the jurisdiction to determine the amount of such compensation to the Shipping Board in the first instance, and thereafter at the election of the contractor to the court of claims when, as here, the amount exceeded $10,000.

Undoubtedly the right of the defendant to retain any part of this money paid by the government depends upon the rights of the parties resulting from the cancellation of the contract. By reason of such cancellation the consideration for the payment of the progress installments has not been rendered. The shipbuilder is entitled to just compensation for work and labor theretofore done under the contract and for other losses suffered by it because of termination of the contract. If the District Court has a right to consider the equitable claims of the defendant to retain the money paid to it, it must be restricted in such inquiry to the consideration of what is just compensation to the defendant for its losses resulting from the cancellation of the contract. This is exactly the course pursued by the trial court. It determined the amount of just compensation the defendant was entitled to by reason of the termination

of the contract and set off that amount against the claims of the government. This course was advocated by the defendant, hence there is no question but that the trial court actually exercised the jurisdiction to determine the amount of defendant's just compensation for the cancellation of its contract, either on the theory that such compensation constituted equities to be deducted from plaintiff's claim or by reason of set-off. We will consider the jurisdictional question after passing upon some other branches of the case.

█ The next question presented is with relation to the money alleged to be due from the defendant to the government on account of rental on a shipyard. The facts with relation to this matter may be briefly stated: The defendant had been very successful in its shipbuilding operations in its own yards under its first contract with the Fleet Corporation, and in order to enable it to expand its facilities and make prompt deliveries of 45 ships then contracted for, the Fleet Corporation purchased an adjoining shipyard belonging to the Seattle Construction & Dock Yard Company, thereafter known as defendant's Plant No. 2, for $4,187,033.39, and leased the plant to the defendants for two years upon an agreed rental to be paid in 30 installments of $125,000, aggregating $3,750,000; each installment to be paid concurrently with the delivery date of each of 30 ships. Defendant paid on this account $514,441.40 and no more, and occupied the premises 2 years lacking 3 months. The lease provided that upon the payment of the 30 installments and certain additional amounts the Fleet Corporation would convey the plant to the defendant. The defenses to this claim are based entirely upon the results of the cancellation of the shipbuilding contract. The lease was an agreement entirely separate and distinct from all the other contracts between the parties, with the exception of the fact that the rental installments were based upon the number of ships to be built and the time of payment was fixed with relation to the delivery dates of the ships. The right of the government to recover the rental agreed upon in the lease would seem to be perfectly clear, while the right of the defendant growing out of the cancellation of the contract is a part of the just compensation to be awarded to it because of the cancellation of the shipbuilding contract.

The question of the nature of defendant's remedy upon the termination of its shipbuilding contract is important in this case because of the question of jurisdiction to award just compensation to be herein considered later.

The government claims that the District Court had no jurisdiction to consider that matter. The defendant, however, defends upon the claim that the action of the government in canceling the shipbuilding contracts made impossible the performance of its rental contract. We are unable to see any merit in this claim, as distinct from the question of just compensation for such cancellation. Defendant utilized the yard and declined to pay rent thereon; it appears from the evidence that it made a profit of $11,000,000 upon the ships built in the yard, but this is entirely beside the question, because what the defendant had agreed to do was to pay the several rental installments agreed upon to entitle it not only to enjoy the possession of the premises, but also to acquire the ownership thereof upon completion of the payments. The government was compelled to take over the yard three months before the lease expired, by reason of the nonpayment of the rental, and sold the same for $600,000 to other parties.

In presenting its claims to the Shipping Board for the allowance of just compensation for the cancellation of its shipbuilding contracts, the defendant claimed "a loss on Plant No. 2 on account of buildings and equipment, refund of lease payments to the Emergency Fleet Corporation, and carrying charges amounting to $2,285,779.04." This, it will be observed, is almost exactly the amount of the 27 installments of rent which the government seeks to recover less amount of rental paid, or net recovery of $2,860,558.60. The Shipping Board in its award of October, 1924, allowed on this item as just compensation for defendant's loss $725,550.83. The auditor to whom the case was referred by the trial judge increased the allowance on this item for "just compensation" over $1,000,000, allowing $1,777,873.48. The trial court adopted a different theory allowing the government only a reasonable rental for its occupation of these premises, reducing the amount due the government from $2,860,558.60 to $1,082,685.12. It is clear that whatever allowance the defendant is entitled to on account of the rentals reserved in the lease is one of just compensation, and has been so considered by the defendant in its claim presented to the Shipping Board and to the trial court. Unless the trial court had jurisdiction to determine the amount of defendant's claims for just compensation, it did not have jurisdiction to make these allowances on account of principal and interest of rent under the lease. The situation is the same as if the lease were with some third party. The defendant would be required to pay the rental reserved in the lease

and recoup its losses from the government, due to the cancellation of the shipbuilding contract, under its award of just compensation for such cancellation.

### The Bonus.

In the case of contracts Nos. 309 and 324:

These contracts provided for a specified bonus of $50,000 for each ship delivered on or before the dates therein provided, as follows, to wit:

"Should the contractor succeed in delivering any of the vessels to the owner complete on or before the dates above provided, the owner agrees to pay as premium for advanced delivery the sum of $50,000.00 for each completed vessel so delivered. In the event the contractor should be delayed in delivering any vessel within the times provided, solely because of any act or default of the owner under the terms of this contract, and the contractor could and would have delivered such vessel within the time provided but for the owner's act or default, and furthermore, if the contractor shall succeed in delivering such vessel within such extension of time as shall be allowed it because of the owner's act or default, the aforesaid bonus shall be payable to the contractor. Any delay due to failure of a common carrier to deliver material or equipment, if shipped within such time as to reach its destination in the ordinary course of business, shall likewise act as an extension of the delivery dates in the manner and for the purpose hereinabove provided. Should the contractor fail to deliver any of said vessels within thirty (30) days after the dates herein fixed, the contractor agrees to pay the owner as liquidated damages on each such vessel the sum of twenty-five thousand dollars ($25,000), provided, however, that, if the contractor is allowed an extension of time for any of the causes herein set out in Article III, Section Two (2), the aforesaid liquidated damages shall not become due and payable, if the vessel is delivered within such extended time. In the event that some of the vessels are delivered after the times herein fixed and other vessels are delivered prior to the times herein fixed, then the number of days gained on any ship delivered ahead of the schedule date shall be applied and credited against the number of days lost on any ship or ships delivered after the schedule date, and the contractor shall receive the bonus herein provided on all ships when delivered, deliveries of which have averaged to come within such schedule dates. In case the days lost on any delayed ship have not been made up by predelivery of ships prior to delivery of such delayed ship, then the bonus on any delayed ship shall be paid when the days lost thereon shall have been made up by subsequent deliveries of ships prior to the scheduled dates."

These contracts were modified July 18, 1918, by a supplemental contract, providing for the alteration of the construction of 46 of the 9,600-ton ships from transverse to the Isherwood system of longitudinal construction. The exact terms of the supplemental agreement bearing upon the question of bonus are important and are quoted, in part, as follows:

"That whereas the contractor is constructing and/or is to construct for the owner fifteen (15) 9,600-ton deadweight steel cargo-carrying vessels under contract No. 309 S. C., dated May 27, 1918, and thirty-one (31) 9,600-ton deadweight steel cargo-carrying vessels under contract No. 324 S. C. dated June 1, 1918; and the contractor believes that the change in the type of construction of said vessels from the transverse to the Isherwood system would result in earlier deliveries and the price of each vessel so constructed reduced, due to the use of a lesser amount of steel. * * *

"It is agreed that relative to the said forty-six (46) 9,600-ton deadweight steam steel cargo-carrying vessels now being constructed or to be constructed by the contractor under said contracts Nos. 309 S. C. and 324 S. C., the contractor may, at its option, change the type of the construction of any of said vessels from the transverse to the Isherwood system. * * *

"Changes in dimensions of vessels will be permitted, but deadweight tonnage must not be reduced below 9,600 tons and vessels must make speed required in contracts 309 S. C. and 324 S. C.

"In addition to the fifty thousand dollars ($50,000) bonus, provided for in said contracts the owner will pay an additional bonus to the contractor of eight hundred dollars ($800) per day per vessel for each and every day said vessel is delivered prior to the respective delivery dates specified in said contracts. In all other respects, the clause providing for bonus and liquidated damages in contracts No. 309 S. C. and No. 324 S. C. shall remain in force."

In construing these provisions for the purpose of ascertaining whether the "delivery date" for purposes of computing bonus is changed by extensions of the contract, it is urged by the government that the terms of contract No. 447 between the same parties made the same day, July 18, 1918, as the

above-mentioned supplemental agreement modifying contracts No. 309 S. C. and No. 324 S. C., which provided for the construction of 12 steam carrying vessels of 9,600 tons, should be looked to for the purpose of construing the supplemental agreement. This course is proper. Contract No. 447 contains the same provisions as to the specific $50,000 bonus as contracts No. 309 and No. 324, above quoted. It also provides for a bonus of $800 per day "for each and every day that said vessel is delivered prior to the delivery date specified herein," differing from the supplemental agreement above quoted by the use of the words "specified herein" instead of "specified in said contracts."

The contention is that the two contracts, using practical identical language, made the same day, should be construed the same way, and that as in contract No. 447 the question of the effect of extensions upon the specific bonus of $50,000 is carefully dealt with, and that some of the causes for extending the delivery date of the contract are made applicable to the bonus and others are not, and thus the delivery date of the ships for the purpose of determining the right to the specific bonus is different from the date of the contract and from the extended date of delivery of the contract, that it follows that the daily bonus of $800 is to be computed with reference to the contract date for delivery fixed by the contract and not with reference to the extended date of delivery resulting from delays provided for in the contract. The fact that in the supplemental contract and in contract No. 447 the parties definitely agreed upon the effect of certain causes of delay, with reference to the payment of the specific bonus of $50,000, tends to show that the daily bonus was to be paid because of completion before the specified date fixed for delivery, as expressly stated in the contract, otherwise the same difference, due to the nature of the cause of delay which was agreed to on the lump-sum bonus, would have been applied to the daily bonus.

The original delivery date specified in contract No. 309 for hull 1734 to be completed March 18, 1919, and the hull was delivered April 2, 1919. The district manager of the Fleet Corporation had extended, tentatively, the delivery 8 days on account of alterations and 55 days on account of a general strike. This 63-day extension made the delivery date May 20, 1919, and the ship was actually delivered 48 days prior to the expiration of that period. The government paid a bonus of $800 per day for this 48 days, aggregating $37,600.

On hull No. 1735 under the same contract, a 63-day extension was tentatively granted for the same reason, and the ship was delivered 44 days before the expiration of this extended period. The government paid a bonus of $35,200. For the reasons above stated the bonus should not have been paid. These two items, $37,600 and $35,200 paid to defendant on June 3, 1919, as per diem bonuses for ships constructed under contract No. 309, were erroneously paid, and the payments were made under such circumstances that they are recoverable by the plaintiff.

█ It is claimed that there is also an overpayment of bonus of $40,000 because of the fact that the local agent of the Fleet Corporation assumed that the bonus clause of the supplemental agreement referred to all of the ships covered by the original contract; whereas, it in fact is claimed that it applied only to the ships of 9,600 tons. The question is whether or not the words "said vessels" in the above-quoted excerpt from the above-mentioned contract, supplemental to contracts No. 309 S. C. and No. 324 S. C., applies to all the vessels to be constructed under said contracts No. 309 S. C. and No. 324 S. C., or only to the 9,600-ton ships for which a new method of construction is provided in the supplemental agreement. Contract No. 309 S. C. provided that 4 of the ships constructed under the contract should be of 8,800 tons, and that 4 of the ships were so constructed. The above-quoted recitals of the said supplemental contract as to its purpose makes it clear, I think, that the additional bonus of $800 per day applied only to the 9,600-ton ships covered by the supplemental contract. These 9,600-ton ships were the "said vessels" referred to in the bonus clause of the supplemental contract providing for a daily bonus of $800. The bonus allowance of $40,000 paid on these 8,800-ton ships (hull Nos. 1925 to 1928, inclusive) I therefore think constituted an overpayment. It is the view of the majority of the court, however, that these payments under contract No. 324 of $6,400 on November 14, 1918, $16,800 on January 11, 1919, $10,400 on February 3, 1919, and $6,400 on May 1, 1919, were made under provisions of the contract so uncertain and under such circumstances that they are to be deemed voluntary and not recoverable, whatever view may be taken of the true meaning of the contract.

As to the plaintiff's claim of overpayment of bonus of $1,000 under contract No. 175, in the view of the majority of the court, in which I do not concur, it was earned and hence cannot be recovered.

Another item of bonus claimed by defendant grows out of the delivery of hull No. 1946 under contract No. 324 S. C. The hull was completed December 13, 1919, and was not delivered until December 24, 1919. The defendant tendered the ship on December 13, 1919, on condition that the Fleet Corporation comply with the obligation imposed upon it by the terms of the contract; that is, to pay the balance of the contract price, $369,000. As the defendant had been already overpaid and the condition in the tender was unjustified, it is not entitled to a bonus for the period of 11 days during which it retained custody of the ship, or $8,800. The defendant in his cross-appeal claims $546,400 daily bonus on vessels completed under contract No. 309 S. C. and $456,000 under its contract No. 324 S. C. as modified by supplemental agreement, less credits of $210,400 on No. 309 S. C., and $46,400 on contract No. 324 S. C., bonus paid, i. e., the above item of $40,000 paid on the 8,800-ton hulls 1925 to 1928, inclusive, and $6,400 properly paid on hull 1943. The defendant thus counterclaims for a balance of $745,600 on account of such per diem bonuses under contracts No. 309 and No. 324 which it contends were earned but have not been paid. The court below allowed $33,600 of this claim and rejected the balance.

For the reasons stated, no part of it was earned, and the court below was in error in making the allowance of $33,600.

### To Recapitulate.

The plaintiff seeks to recover items of overpayment of bonus aggregating $113,800 paid to the defendant from time to time on account of per diem bonuses upon the theory that such items were not earned and were paid through mistake. Of the aggregate, $1,000 was paid under contract No. 175, $72,800 under contract No. 309, and $40,000 under contract No. 324. There is substantially no difference in the terms of the two latter contracts.

It is held that in respect to the subject of bonuses, the defendant is entitled to no further credits and that the government should recover $72,800.

We will now consider the question of the jurisdiction of the trial court to determine and allow the defendant just compensation for its losses suffered by reason of the cancellation of its shipbuilding contracts. The law authorizing the suspension of work by the order of the President of the United States not only provided that the contractor should be given just compensation, but expressly provided a method of ascertaining that compensation. It provided that the President of the United States should consider and determine the claims made by the contracting party. 40 Stat. L. 182, c. 29. Later, the United States Shipping Board was substituted for the President. Merchant Marine Act 1920, 41 Stat. 988, § 2(c), 46 USCA § 862(c). This determination was not binding on the contractor unless he chose to accept it. If he accepted the award of the Shipping Board, he immediately became entitled to the full amount thereof and it was audited and paid without any further authority from Congress so to do, if the funds were available therefor. On the other hand, if the contractor desired to contest the award made by the Shipping Board, he was, notwithstanding that fact, entitled to immediately collect 75 per cent. of the amount allowed him as just compensation, and such amount was treated as a claim audited by the Shipping Board and immediately payable by the fiscal officers from available appropriations. As to the balance of the claim of the contractor, he was given the right to sue the United States in the Court of Claims and to recover such further sum as, added to the 75 per centum, will make up such amount as will be just compensation as determined by that court. In the event the claim was less than $10,000, however, such suit might be brought in the District Court. 40 Stat. 182, 183, incorporating by reference section 24, par. 20, and section 145 of the Judicial Code, now 28 USCA § 41 (20) and section 250. The law creating the right to terminate the contract provided also the remedy of the contractor for its termination and fixed the tribunal in which controversies over the amount of that compensation should be determined. See U. S. ex. rel. Skinner & Eddy Corp. v. McCarl, 275 U. S. 1, 48 S. Ct. 12, 72 L. Ed. 131. The defendant submitted its claim for $20,347,170.60 for just compensation, and for $3,899,948.71 for performance, to the auditor for the state and other departments, who transmitted the claim to the Fleet Corporation, which referred it to the United States Shipping Board, and conceded credits to the government of $6,230,142.60 leaving a net balance claimed of $18,016,976.71.

It will be observed that the award of the Shipping Board, although binding on the government, could be treated by the shipbuilder at his election as a liquidation of his entire claim, or that he could treat the claim as liquidated only to the extent of three-fourths of the award and proceed to litigate his claim to an additional award designated in the act creating the right. The contrac-

tor, without collecting the three-fourths of the award made it by the government, for it had more than that amount belonging to the government already in its possession, sued the government in the Court of Claims on June 15, 1921, for over $17,000,000 as its just compensation. Skinner & Eddy Corp. v. U. S., 58 Ct. Cl. 663. The government filed a counterclaim therein, thereupon the appellant moved to dismiss its suit, the motion was granted, later that order was vacated, but the latter order was held erroneous by the Supreme Court of the United States in Re Skinner & Eddy Corp., 265 U. S. 86, 44 S. Ct. 446, 68 L. Ed. 912. It also brought an action April 30, 1923, in the United States District Court in the superior court of King county; state of Washington, for $9,129,-401.14, being the same amounts theretofore sued upon in the Court of Claims, less anticipated profits, which had been denied on similar conditions in Russell Motor Car Case, 261 U. S. 514, 43 S. Ct. 428, 67 L. Ed. 778. The latter case is still pending.

It is contended by the defendant that the District Court has jurisdiction to determine the amount due it as just compensation by reason of a right of set-off accorded to the defendants in suits brought by the government of the United States by section 951, Rev. St. (28 USCA § 774).

The government, in its complaint, concedes a set-off to the defendant of the full amount of the award by the Shipping Board and deducted this set-off, and only prayed for a judgment for the balance alleged to be due to the government, so that the question presented here is not strictly a question of whether or not the defendants in the action brought by the government can set up a claim for just compensation, but whether it can in this action litigate the correctness of the award of the Shipping Board and have the District Court adjudicate the amount of its just compensation of over $10,000, where otherwise the determination of that amount must be made by the Court of Claims. The Congress of the United States, as early as 1797, granted the right to sue the government by way of claims for credit, solely as a defense, in suits brought by it and incidentally to adjudicate the amount of such claims where they had been presented to the accounting officers of the treasury and by them disallowed in whole or in part. Act of March 3, 1797, c. 20, § 4, 1 Stat. 515, Rev. St. § 951, 28 USCA § 774. Without present attempt to trace the legislative or judicial history of this provision of the law concerning set-off, it is enough for our purpose to say that the matter has been very recently considered by the Supreme Court of the United States in cases growing out of war contracts, and the more recent legislation providing for the determination of the rights of individuals growing out of the World War operations of the government. In the case of United States v. Pfitsch, 256 U. S. 547, 41 S. Ct. 569, 65 L. Ed. 1084, such legislation was reviewed, and it was held that the right of the plaintiff in that case to just compensation for property requisitioned for the use of the United States Army of a value less than $10,000 was to be adjudicated by the United States District Court by virtue of the jurisdiction conferred upon it by the provisions of section 10 of the Lever Act (40 Stat. 276, 279), rather than by the general provision of law giving concurrent jurisdiction of the District Court with the Court of Claims in case of claims against the government amounting to less than $10,000. The importance of that decision here is that the decision turned upon jurisdiction of the Supreme Court of the United States to entertain a writ of error to the District Court and involved the question of the right to trial by jury in the District Court. It is there held that the jurisdiction in the District Court is exclusive under the provisions of the Lever Act and that this exclusive jurisdiction was not modified by the general provisions of law with relation to the jurisdiction to adjudicate claims against the United States. That decision is not decisive of the question involved here with reference to the right of a defendant to assert a set-off or counterclaim based upon the provisions of the Lever Act or similar legislation, except to the extent that the opinion is based upon the proposition that the jurisdiction conferred by the Lever Act on the District Courts is exclusive, notwithstanding the former legislation, which in the absence of the jurisdictional limitations of the Lever Act would have permitted the matter to be adjudicated either in the Court of Claims or in the District Court at the option of the claimant and in either case by the court without a jury. In other words, the Supreme Court holds that this subsequent war legislation modified previous legislation on this subject so far as was necessary to accomplish its purpose—a rather obvious conclusion.

The reasoning of this opinion applies to the similar provisions of the Emergency Shipping Act (Act of June 15, 1917, c. 29, 40 Stat. 182), involved herein, giving exclusive jurisdiction to the Court of Claims of all claims over $10,000 as provided for by section 24, par. 20, and section 145 of the Judicial Code, 28 USCA §§ 41(20) and 250. We thus have here the antithesis of the situ-

ation considered by the United States Supreme Court in United States v. Pfitsch, supra, in that there exclusive jurisdiction was conferred by the Lever Act upon the District Court, and here exclusive jurisdiction is conferred upon the Court of Claims over all claims exceeding $10,000 and concurrent jurisdiction with the District Court of claims of $10,000 or less. The same considerations of statutory construction which would give exclusive jurisdiction to the District Court of claims against the government under the Lever Act regardless of the amount involved would, under the Emergency Shipping fund provisions of the act of 1917, supra, give exclusive jurisdiction to the Court of Claims as to all such claims over $10,000. As to whether or not these considerations apply to counterclaims for just compensation to be awarded against the government under these acts, we are not left in doubt, for that question was later squarely presented to the United States Supreme Court under similar legislation in Nassau Smelting Works v. United States, 266 U. S. 101, 45 S. Ct. 25, 69 L. Ed. 190. There, in an action instituted by the government in a District Court to recover money for property sold by it to the defendant, the defendant set up by way of set-off or counterclaim a right to just compensation for property it had delivered to the government, in pursuance of an unauthorized contract; one item being for $6,223.81, and another for $5,836.42, and the third $2,576.09. "The defendant's contention was that, as each counterclaim was for less than $10,000, subdivision 20 of section 24 of the Judicial Code of the United States * * * court jurisdiction to find and award, by way of counterclaims herein, a fair and just compensation to the defendant from the United States." The trial court held that it was without jurisdiction to adjudicate such a claim presented by way of set-off to the action of the government. The question was taken directly to the Supreme Court by writ of error on the ground that "jurisdiction of the court was in issue and the order dismissing the set-offs or counterclaims was based solely on the ground that the court had no jurisdiction to determine them." It was contended there, as it is here, that the jurisdiction of the District Court was derived from the first paragraph of section 24 of the Judicial Code, giving the District Court jurisdiction of suits brought by the United States (28 USCA § 41 (1), and therefore the matter could not be taken directly to the Supreme Court under section 238 of the Judicial Code (28 USCA § 345). The court said: "But we think that unquestioned jurisdiction over the complaint does not prevent a certificate as to jurisdiction of the new suit attempted in the form of a counterclaim. The question is not one as to the introduction of counterclaims as a mere matter of procedure. The objection to a suit against the United States is fundamental, whether it be in the form of an original action, or a set-off, or a counterclaim. Jurisdiction in either case does not exist, unless there is specific congressional authority for it. Nor is there doubt that the question is one which involves the jurisdiction of the District Court as a federal court under the statutes of the United States, for the jurisdiction of the District Court in this regard is wholly dependent on such statutes."

To the contention by the plaintiff in error that the court had jurisdiction over such counterclaims by paragraph 20 of section 24 of the Judicial Code (28 USCA § 41 (20), as each claim was less than $10,000, the court replied: "The fatal objection to this argument is that these claims are based exclusively on the Dent Act (Act March 2, 1919, c. 94, 40 Stat. 1272, 1273 [50 USCA § 80 note]). * * * By section 2 of the act the Court of Claims is given jurisdiction on the petition of the claimant described in section 1 of the act to find and award fair and just compensation in such cases, if the claimant is not willing to accept the compensation offered by the Secretary of War. There is no other provision in the act for judicial action than this. This must be held to be an exclusive jurisdiction conferred upon the Court of Claims. This was the view of this court as shown in United States v. Pfitsch, 256 U. S. 547, 553, 41 S. Ct. 569, 65 L. Ed. 1084. In that case all the statutes which had been passed during the war giving jurisdiction to various courts of the United States for judicial settlement of controversies with the government, were considered and commented on, and among the four instances in which jurisdiction was said to be conferred only on the Court of Claims was the Dent Act. * * * The defendant below placed itself squarely within the requirements of the Dent Act, and sought adjudication of its claims on the ground that the agreements under which recovery was sought had not been executed in the manner prescribed by law. In this way it put itself outside the field covered by paragraph 20 of section 24 of the Judicial Code, and by its own admission limited itself to the remedy possible under the Dent Act. It is unnecessary for us to consider therefore whether but for the Dent Act it might have brought suit under the general language contained in paragraph 20 of sec-

tion 24. The effect of the Dent Act was to limit it to the Court of Claims. The District Court, therefore, was right in holding that it had no jurisdiction of the counterclaims and in giving judgment on the pleadings for the government."

The first decision (United States v. Pfitsch, supra) is to the effect that the more general provisions of the law giving jurisdiction with reference to claims against the United States are modified and controlled by the subsequent legislation contained in the Lever Act and corresponding acts. The effect of the later decision (Nassau v. United States, supra) is that the jurisdictional provisions of such legislation apply to such claims when set up as a counterclaim or set-off to the government's suit as well as in cases where an independent suit is filed against the government. It is true that in the latter case the defendant predicated his right to assert his set-off in the District Court on the statute expressly conferring jurisdiction on the District Court to entertain suits against the government for amounts less than $10,000, which provision would be inapplicable here because the amount involved is over $10,000, and did not advance the claim that the general right of defendants to assert a set-off, in suits brought by the government, conferred jurisdiction on that court under title 28, § 774, USCA, relating to the assertion of credits in suits brought by the government, but it is not likely that these provisions escaped the attention of the Supreme Court in determining the jurisdiction of the District Court to entertain counterclaims or credits based upon just compensation. If the District Court has jurisdiction here under 28 USCA § 774, it also had it there.

The Dent Act under consideration in Nassau v. United States created a legal obligation upon an unauthorized contract in recognition of the moral obligation of the government under such a contract. In that sense it created a right where none had theretofore existed. The law recognizing this moral obligation vested power to determine the extent of that obligation in a single court, the Court of Claims. The situation here is analogous, for the reason that the right to just compensation and the remedy for the enforcement of the right were embodied in the same statute, and by implication, in the contracts canceled. The government, in lieu of the above legislation providing for cancellation of the contract, might have permitted the cancellation of that contract without any redress at all. So that here the right and the remedy are given by the same statute, as in the Dent Act. Furthermore, the situation here is as though the parties to the contract had agreed that in the event of a cancellation of the contract by the government that a just compensation to be awarded by the government should be ascertained in the first instance by the President, or under later legislation by the Shipping Board, and in the event that award was not accepted, by the Court of Claims. Consequently, if it has been determined by previous decisions of the courts, that the legislation of 1797, establishing the right of set-off, was or is sufficiently broad to cover such a claim as defendant asserts in this litigation to just compensation, that right has been restricted and modified by the war-time legislation otherwise defining the jurisdiction of the courts as to such claims. In view of this situation, it is unnecessary to analyze or distinguish cases with reference to the character of set-off permitted under the general right of set-off given by 28 USCA § 774. It is enough to say that this more recent legislation has fixed the jurisdiction of the courts, not only with reference to original suits, but also to counterclaims and set-off. In this connection, however, it may be said that the primary question, involved in the earlier cases which considered the statute permitting a set-off, was as to whether or not the government had consented to be sued and thus waived its sovereign right to exemption from suits brought by private individuals and not the question of jurisdiction to entertain such set-offs, as the Court of Claims had not yet been established. Here, there is no such question involved, for the statute expressly gives the defendant a right to sue the government and defines that right and regulates the jurisdiction of the courts with reference thereto. The question here is not of permission to sue, but of jurisdiction. That jurisdiction is not left to doubt or uncertainty, nor to a doubtful construction of earlier legislation, but is expressly determined by the very act awarding just compensation. Congress had the right to determine for itself the just compensation to be allowed on such unliquidated claims against the government and to determine what amount it would pay on all government obligations. It also had the power to delegate to a court or board the right or jurisdiction to determine such amounts, and before or after such determination to make such appropriations as are necessary to carry out the obligations of the government thus established. It is perhaps unnecessary to discuss the policy or attitude of Congress toward the multitude of claims, difficult of adjudication, growing out of the enormous operations of the government during the World

War, but it is obvious that the ordinary fiscal policy of the government requires consistency in arriving at amounts to be paid and in the payment thereof. Was it the intention of Congress that claims of this difficult type against the government, of over $10,000, amounting sometimes to scores of millions of dollars, should be determined by Juries in District Court proceedings, or by the judges of the Court of Claims trained in the consideration of intricate problems involved in such determinations? The legislation under consideration here involved the expenditure of billions of dollars and the determination of just compensation under canceled contracts, the consideration of the complex situations arising from these vast operations and from the sudden cessation of the war and the cancellation of the contracts entered into for the purpose of winning the war. The trial court, instead of determining this case by common-law trial before a jury, referred the problems involved to an "auditor and master," who spent more than a year's time in arriving at a conclusion which he reported to the court. It is obvious that the trial of such a matter, involving such complications, before a jury, would not only result in great hardship to the jury, and tremendous interference with the other business of the court, but that the conclusion of the jury would be very apt to be erroneous because of the difficulty, we might say impossibility, of carrying so great a mass of evidence in mind for so long a period. The report of the auditor on this subject is illuminating: "The complaint seeks the recovery of the balance due upon all the transactions involved. The pleader has seen fit to divide the plaintiff's case into fourteen separate counts at law. Because of the complicated nature and the volume of the transactions the court has appointed an auditor as to thirteen and a special master in chancery as to one of the counts. The gist of the proceedings is an accounting of transactions so numerous, so voluminous and so complicated as to have been justly considered to be beyond the ken of a jury."

The defendant complains of the hardship involved in an interpretation which would permit the government to assert its full claims without set-off against it and force it to adjudicate its claims in the Court of Claims. The situation is not as difficult as it suggests for this reason, that the amount of its claim has already been determined by an agency selected by Congress for that purpose. The government concedes the right to set off the amount of its claim thus adjudicated. If the defendant accepts that adjudication or determination, there is no difficulty in the situation. As it declines to accept that determination, it has the right to set up three-fourths of the amount so fixed, by way of set-off, for that amount is liquidated and immediately payable upon the election of the defendant to accept it. So the real question involved here is, not the right of the defendant to set off a liquidated claim against the government, but its right to litigate the amount of its claim against the government over and above the amount fixed as just compensation by the Shipping Board in the District Court, or whether it shall be required to pursue the course fixed by Congress to determine the amount of such compensation and thus liquidate its claim. We see no escape from the conclusion that the District Court had no jurisdiction to determine the amount of defendant's just compensation. The case of Nassau Smelting Works v. U. S., 266 U. S. 101, 45 S. Ct. 25, 69 L. Ed. 190, in effect so decides, and can only be avoided by the claim that the Supreme Court overlooked 28 USCA § 774, but the basis of that decision is as conclusive against jurisdiction under 28 USCA § 774, as under 28 USCA § 41(20). We conclude that the claims of the defendant for just compensation against the government are within the exclusive jurisdiction of the Court of Claims, whether the right be asserted by an original suit or by way of counterclaim, and that the District Court had jurisdiction of the other set-offs claimed. The trial court was without jurisdiction to settle and allow claims for set-off on account of just compensation for defendant's losses on account of the cancellation of its contracts in excess of the amount allowed by the Shipping Board.

### Interest.

█ The views of the majority of the court on the subject of interest are expressed by the following portion of this opinion in quotations:

"The subject of interest is not free from perplexity and touching certain phases of it the members of the court are not in full accord. By all the rate is agreed to be 6 per cent. prescribed by the Washington statutes and upon other points the views and conclusion of the majority may be thus stated:

"The rule which ordinarily forbids the allowance of interest on claims asserted against the United States is not strictly applicable. The United States is here the actor and is suing upon claims which did not arise out of transactions which in its governmental capacity it had directly with the defendant. They spring from contracts and dealings between

defendant and the Fleet Corporation, a quasi private corporation. That such was the latter's character and status has been authoritatively declared, and we need not stop to amplify. The government sues as a successor to its rights, and we do not think that the succession materially affects the subject of interest upon the claims either against or by the defendant. The government merely stepped into the shoes of the Fleet Corporation and in respect to interest it has the footing of that company—no better and no worse. From time to time in the course of their dealings items of credit accrued in favor of defendant and other items in favor of the Fleet Corporation, and in adjusting and settling such items, even when liquidated, so far as is shown it was not the practice for either party to charge or to pay interest. When notice was given of the cancellation of the contracts, the status of the account was such that there were outstanding liquidated items of credit in favor of each party and there were also some unliquidated claims. In the course of the negotiations which followed, most, if not all, of these claims became liquidated by agreement. No reference is here intended to the factors of 'just compensation' attending the cancellation of the contracts—a distinct subject which must have separate consideration. During the long period intervening between the date the contracts were canceled and October 30, 1924, various efforts, both in and out of the courts, were made to consummate a complete settlement but without avail. On the latter date the Shipping Board, which not only had the authority in the first instance to determine the amount of 'just compensation' for the cancellation of the contracts, but to make settlement of the entire controversy in all of its aspects, held a meeting and after consideration entered an order fixing just compensation and also stating the full amount of what was conceived to be the Fleet Corporation's net demand against the defendant. Manifestly at that time the whole account arising under the several contracts had had careful consideration by the legal department as well as by the Board itself, and it was determined that the net balance due the Fleet Corporation was $7,536,432.08. This was after allowing as offsets all items of credit held to be due Skinner & Eddy, including the amount of 'just compensation,' then fixed by the Board at $2,615,992.06. As indicated, the $7,536,432.08 was arrived at by offsetting without interest either way the credits due Skinner & Eddy against the credits due the Fleet Corporation. And we think there is no doubt that if Skinner & Eddy had

conceded the correctness of the Board's conclusion touching the several items and acquiesced in the award of just compensation, the Board would have accepted in full settlement the net balance thus appearing to be due. True, Skinner & Eddy were not bound to accept the statement of account thus made any more than they were bound to accept the award, and not having accepted it, it was not conclusive or binding on either party; it did not become an 'account stated.' Nor, on the other hand, was it in any sense an offer to compromise; in so far as appears no such consideration entered into it, and it must be taken as expressing the Board's conception of the full amount of its legal claim.

"In respect of the subject under consideration, the significant aspect of this formal statement of account, made after long and mature consideration by the Board and its legal department, is that in harmony with the apparently usual practice it incorporated no charges or credits on account of interest. Under the circumstances, the natural inference would therefore seem to be that by common understanding from the beginning interest was not to be charged until the accounts were audited and adjusted and demand was made for the balance. And if this be true, the mere fact that Skinner & Eddy declined to accept the statement as correct would not operate to nullify the understanding or to create an obligation that had theretofore had no existence. The obligation to pay interest would commence only with the statement of the account and a demand for the payment of the net balance claimed to be due, to wit, October 30, 1924. It is also to be observed that the account not being 'stated,' its correctness remained open to challenge at the instance of either party; but if in law or fact any item upon either side is, upon investigation, found to be erroneous, that fact would in no wise affect the point under consideration."

■ The amount the plaintiff is entitled to recover is $9,252,805.38, itemized as follows:

| | |
|---|---:|
| Count 1 of the complaint, payment of cancelled ships | $4,612,500 00 |
| Count 2, Erroneous payments on overtime | 57,734 97 |
| Count 3, Turbines, etc., sold to defendant | 802,349 56 |
| Count 4, Material sold to defendant | 623,387 46 |
| Count 5, Rental | 2,860,553 60 |
| Count 6, Equipment removed from plant 2 | 146,150 10 |
| Count 7, Damages to derrick | 3,750 00 |
| Count 8, Sundry accounts stated | 2,660 60 |
| Count 9, Defective workmanship repaired by plaintiff | 9,288 43 |
| Count 10, Bonus overpayment | 72,800 00 |
| Count 13, Omission of equipment | 35,501 60 |
| Count 14, Changes and extras | 26,124 42 |
| | $9,252,805 74 |

From this total the defendant is entitled to set off the sum of $1,692,690.10. This item of set-off is itemized as follows:

Item No.

1. Balance contract price for ships.... $ 922,500 00
2. Specific bonus contract No. 309...... 200,000 00
3. Specific bonus contract No. 324..... 250,000 00
5. Overtime ............................ 232,797 63
6. Pay off on company time............. 25,378 33
7. Increased freight ................... 5,514 46
   War tax on freight.................. 25,929 94
8. Opening boilers, etc................. 8,867 45
9. Repairs to ships.................... 316 28
10. Covering exhaust pipes.............. 21,398 00

$1,692,702 09

The balance, $7,560,103.65, bears interest from October 30, 1924, at the rate of 6 per cent. per annum, in accordance with the aforesaid majority opinion.

The defendant has a right to set off as just compensation against this total the just compensation awarded by the Shipping Board on October 30, 1924, of $2,615,992.06 as of that date, if it so elects, so that the balance only of $4,944,111.59 would bear interest at 6 per cent. from October 30, 1924. It should be added that from the beginning, by the prayer of the complaint, and in other ways, the government has conceded that the principal amount of its claim is to be reduced by the amount of "just compensation." Although its right so to do is conceded by the plaintiff, such an acceptance by the defendant would be an acceptance of the award, and consequently would prevent the further litigation of its claims in that regard, in the Court of Claims. The judgment will be entered within 30 days after the mandate for $7,560,103.65 with 6 per cent. interest thereon from October 30, 1924, to date of judgment, unless the defendant elects to accept the award aforesaid, in which event the judgment will be for $4,944,111.59 with 6 per cent. interest from October 30, 1924, to date of judgment.

Further as to just compensation: If the defendant fails to elect to accept the award of just compensation as aforesaid, the judgment shall state that the judgment entered is without prejudice to the rights of the defendant to present its claims therefor in the Court of Claims.

The plaintiff sought to withdraw an allowance of $280,313.78 made by the Shipping Board as an item of just compensation for loss on supplies on the ground that the award was made by mistake because that item had been settled by agreement, or on accord and satisfaction. We have not considered that claim here, for the reason that the matter is a part of the evidence to be submitted on the question of just compensation. So far as we are concerned, as the Shipping Board has not attempted to modify its award by any action of its own, we consider only the formal award, in our item of $2,615,992.06. As we have held, the loss of the defendant on Plant No. 2 and other losses alleged to have resulted from the order of cancellation are not considered or adjudicated in this action unless the defendant elects to accept the award.

I dissent from that portion of the judgment with relation to interest upon the amounts found to be due to the government. The importance of this item is clear when it is stated that the amount involved is over $2,555,539, arrived at as follows:

The plaintiff is disallowed interest from date of accrual of items to October 30, 1924, amounting, at 6 per cent., to about $1,655,539. (This figure is taken from the computations made by witness Kennedy with deductions of interest from October 30, 1924, to May 22, 1928.) The defendant is in effect allowed interest on its contract set-offs from date of accrual of the several items to the date of the judgment, now amounting to over $900,000. (I take this figure from the plaintiff's proposed decree, presumably computed to August, 1928.) If we accept the government's contention that its claims bear interest, and those of its creditors do not, the amount of the judgment should be increased by the sum of these two items of $1,655,539, and on $900,000, or over $2,555,539. It is conceded that the law of the state of Washington applies as to the amounts due to the government, and that the rate is 6 per cent. per annum. Under this law interest is computed from the date of accrual of the obligation to pay. See Moylan v. Moylan, 49 Wash. 341, 95 P. 271; Dixon v. Parker, 102 Wash. 101, 172 P. 856; Dickinson Fire & Pressed Brick Co. v. Crowe & Co., 63 Wash. 550, 115 P. 1087; Atlantic Phosphate Co. v. Grafflin, 114 U. S. 492, 5 S. Ct. 967, 29 L. Ed. 221; Parks v. Elmore, 59 Wash. 584, 110 P. 381; 33 C. J. 238; Ralph v. Lomer, 3 Wash. 401, 28 P. 760; Myers v. Ruddy, 154 Ill. App. 438; 38 Cyc. 2090; Harrison v. Perea, 168 U. S. 311, 18 S. Ct. 129, 42 L. Ed. 478. The claims were liquidated and were immediately payable. See Miller v. Robertson, 266 U. S. 243, 257, 258, 45 S. Ct. 73, 69 L. Ed. 265; Northern Pacific R. v. Babcock, 154 U. S. 190, 197, 14 S. Ct. 978, 38 L. Ed. 958; Atchison, T. & S. F. Ry. Co. v. Spencer (C. C. A.) 20 F.(2d) 714, 718, this circuit. On the general subject of interest, and to the effect that the law of the place of payment governs, see also Cairo v. Zane, 149 U. S. 122, 142, 13 S. Ct. 803, 37 L. Ed. 673; Pana v. Bowler, 107

U. S. 529, 546, 2 S. Ct. 704, 27 L. Ed. 424; Coghlan v. So. Car. R. Co., 142 U. S. 101, 110, 12 S. Ct. 150, 35 L. Ed. 951; and as to the rates and law of the state of Washington, see Pierce's Code of 1913, title 263, § 1.

A more difficult situation arises over the defendant's claims for credits in view of the provisions of section 1091, Rev. St. (section 177, Judicial Code, 28 USCA § 284), prohibiting the allowance of interest on claims against the government in the absence of an express contract to pay interest. This rule has been applied in the case of a claim of set-off, where the government owed the defendant money admittedly due (United States v. Verdier, 164 U. S. 213, 218, 17 S. Ct. 42, 44, 41 L. Ed. 407); and also to claims for just compensation for property taken by the government under its powers of eminent domain (U. S. v. N. A. Co., 253 U. S. 330, 336, 40 S. Ct. 518, 64 L. Ed. 935). See, also, Boston S. & G. Co. v. U. S. (Nov. 19, 1928) 278 U. S. 41, 49 S. Ct. 52, 73 L. Ed. 170.

Interest cannot be allowed on claims against the government even though there be mutual claims between an individual and the government. U. S. v. North American Transportation, etc., Co., supra. The rule is stated by the Supreme Court in United States v. Verdier, supra, with reference to the claim of the government against Verdier, a postmaster, to whom the government owed an arrearage of salary not readjusted for many years, that is, from 1869 to 1887, as follows:

"Upon the other hand, the government did not become a debtor to Verdier until his claim was liquidated; and by Rev. St. § 1091, no interest can be allowed upon any claim against the government up to the time of the rendition of judgment thereon by the court of claims, unless upon a contract expressly stipulating for the payment of interest. The theory upon which interest is claimed seems to be that the postmaster general was in fault for not having readjusted Verdier's salary under the act of 1866, and that Verdier ought not to be prejudiced by such default. The whole difficulty in the case, however, arises from the fact that there were claims upon both sides. Did the case of the government stand alone, there could be no doubt whatever that Verdier's estate would be properly chargeable with interest. Upon the other hand, if his accounts had been settled and paid at the expiration of his term, and a claim were now made under the act of 1883, it would not be claimed that the government would be chargeable with interest. The equity of petitioner's claim, if there be any, arises from the fact that, while interest was running

against him on his judgment, the government was equitably his debtor. Were the case between private individuals, perhaps interest would be chargeable to both parties; but we are unable to see how the fact that there were mutual claims can authorize us to disregard the plain letter of the statutes. There is really no greater hardship in denying the petitioner interest than there would have been if he had not been a judgment debtor of the government.

"An inherent vice of petitioner's argument is in the assumption that he and the government stand upon an equality with respect to interest. The truth is that, in its dealings with individuals, public policy demands that the government should occupy an apparently favored position. It may sue, but, except by its own consent, cannot be sued. In the matter of costs, it recovers, but does not pay, and the liability of the individual would not be affected by the fact he had a judgment against the government which did not carry costs. So, the statute of limitations may be pleaded by the government, but not against it; nor is it affected by the laches of its officers. U. S. v. Barker, 2 Wheat. 395 [4 L. Ed. 271]; The Antelope, 12 Wheat. 546 [6 L. Ed. 723]; U. S. v. McLemore, 4 How. 286 [11 L. Ed. 977]; U. S. v. Boyd, 5 How. 29 [12 L. Ed. 36]; U. S. v. Thompson, 98 U. S. 486 [25 L. Ed. 194]; Simmons v. Ogle, 105 U. S. 271 [26 L. Ed. 1087]; U. S. v. Kirkpatrick, 9 Wheat. 720 [6 L. Ed. 199]; U. S. v. Nicholl, 12 Wheat. 505 [6 L. Ed. 709]; Gaussen v. U. S., 97 U. S. 584 [24 L. Ed. 1009]. Under the bankruptcy law, it was a preferred creditor, and its claims were paid even before the wages of operatives, clerks, or house servants. Rev. St. § 5101. In short, the equities which arise as between individuals have but a limited application as between the government and a citizen."

But see National Home for Disabled Volunteer Soldiers v. Parrish, 229 U. S. 494, 33 S. Ct. 944, 57 L. Ed. 1296, where the Supreme Court held that the rule did not apply to a subordinate agency such as the Soldiers' Home. I am of opinion that the set-offs of the defendant against the Fleet Corporation do not bear interest.

The opinion of the majority as to interest on the respective claims of the plaintiff and defendant is based upon an agreement to forego interest, as evidenced by the award of the Shipping Board of October 30, 1924, stating a balance due the government and fixing an award for just compensation. It is conceded that this statement did not become an account stated, so that the opinion pro-

ceeds upon the theory that there was an actual agreement to forego interest. I cannot concur in this conclusion. I do not believe that it is in accordance with the custom or the law to infer an agreement to waive or forego interest from the fact that an account is stated, without the addition of interest. But there is another difficulty in arriving at such a conclusion. The statute of Washington fixes the rate of interest at 6 per cent. and provides that it applies unless by an agreement in writing a different rate is agreed upon. The statute (vol. 2, Remington's Compiled Statutes of Washington, § 7299) is as follows: "Every loan or forbearance of money, goods, or thing in action shall bear interest at the rate of six per centum per annum where no different rate is agreed to in writing between the parties. * * * *" It is not held by the majority of the court or claimed by the parties that there was any express agreement between the parties with reference to interest, so the section fully applies. If there was an implied agreement, as held by the majority, that no interest should be paid, the agreement was not in writing and therefore not effective. Even an express oral agreement to pay a different rate than 6 per cent. is void under the law of Washington. Stickler v. Giles, 9 Wash. 147, 37 P. 293.

At the time the Shipping Board acted on October 30, 1924, over a million dollars and one-half had accrued to the government as interest. Assuming that they had the power to waive this large amount of interest without consideration therefor, which may well be doubted in view of their trust relationship to the government, I think it clear that they did not attempt to do so, and that even if they did such action was void unless in writing.

If the parties had agreed on an account stated, an entirely different situation would be presented for our consideration. See Sayward v. Dexter, Horton & Co. (C. C. A.) 72 F. 758; Porter v. Price (C. C. A.) 80 F. 655; Hornstein v. Cifuno, 86 Neb. 103, 125 N. W. 136, 20 Ann. Cas. 1268, and cases cited.

For these reasons I think the government is entitled to recover interest at the rate of 6 per cent. on the various items of its account. As to the question of interest on the items of counterclaim, I think that the relationship between the government and this governmental agency that the well-known statutory rule above cited applies and that these claims do not bear interest. The consent of the government that the defendant's claims may be set up in this action by way of set-off does not go to the extent of consenting to an allowance of interest in the District Court which it has

expressly prohibited in the Court of Claims. I agree with my colleagues that the Shipping Board had power to settle the whole question of indebtedness, including the matter of interest, but that has not been accomplished because the defendant has declined to make such an agreement.